**UNITED STATES of America,
Plaintiff,**

v.

**TROPICAL FRUIT, S.E.,
et al., Defendants.**

**No. 97–1442 DRD.**

United States District Court,
D. Puerto Rico.

March 31, 2000.

Cindy Gines-Sanchez, Mayaguez, PR, for Movant.

German A. Gonzalez, San Juan, PR, Luis Sanchez–Betances, Sanchez Betances & Sifre, San Juan, PR, for Defendants.

Isabel Munoz–Acosta, U.S. Attorney's Office Distict of P.R., Civ. Div., Hato Rey, PR, for Plaintiff.

### *ORDER*

DOMINGUEZ, District Judge.

Pending before the Court is the Plaintiff's, United States of America ("USA"), motion for partial summary judgment on liability (Docket No. 42). The Defendants, Tropical Fruit, S.E., Avshalom Lubin, Cesar Otero Acevedo, and Pedro Toledo Gonzalez (collectively "Tropical Fruit"), then filed an opposition to the motion for partial summary judgment and cross motion for partial summary judgment on issue of liability under CERCLA (Docket No. 48), an

opposition to motion for summary judgment on issue of liability under FIFRA (Docket No. 50), and an opposition to Plaintiff's Rule 311.12 statement of uncontested material facts. (Docket No. 51). Thereafter the USA filed its opposition to Tropical Fruit's cross motion for partial summary judgment. (Docket No. 52). Tropical Fruit replied to the USA's opposition. (Docket No. 54). The Court is ready to rule.

## I. BACKGROUND

Tropical Fruit, S.E., is a special partnership duly formed pursuant to Puerto Rico law. (Docket No. 42, SOF 1). Its general partners are Avshalom Lubin,[1] Cesar Otero Acevedo, and Pedro Toledo Gonzalez (also president).[2] (Docket No. 42, SOF 4–6). Tropical Fruit owns and operates a finca (English translation "farm") or agricultural facility located at road number 335, kilometer 7.2, Rural Zone Boca, Guayanilla, Puerto Rico. The farm consists of approximately 2,300 acres where mangoes, plantains, and bananas are grown.

Succinctly, the USA alleges that Tropical Fruit has violated federal law Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA"), 7 U.S.C. § 136 *et seq.*, and the Comprehensive Environmental Response Compensation, and Liability Act ("CERCLA"), 42 U.S.C. § 9601 *et seq.*, during the operations of its pesticides applications. The government asserts that

Tropical Fruit when spraying pesticides would frequently spray in such a manner as to cause the pesticides to unlawfully drift onto adjacent properties. To quell Tropical Fruit's illegal pesticides usage, the Environmental Protection Agency ("EPA"), pursuant to CERCLA, issued an Administrative Order ("EPA Order"), dated December 20, 1996, requiring Tropical Fruit, *inter alia,* to cease spraying pesticides that are or contain hazardous substances in such a manner that the pesticides drift beyond the boundaries of its property. (Docket No. 42, Attachment 2—Exhibit 2 ¶ 32); *see also* 42 U.S.C. § 9606(a). The USA maintains that Tropical Fruit nevertheless continued to spray pesticides allowing drift on at least seven (7) separate occasions in contravention of the EPA Order. The USA filed the instant suit on March 26, 1997. (Docket No. 1).

In addition to hand spraying, Tropical Fruit has applied pesticides via two types of airblast sprayers—the "Smart Sprayer" and the "Tower Sprayer". Tropical Fruit applies or has applied numerous "pesticides" within the meaning of Sections 2(u) and 12 of FIFRA, *see* 7 U.S.C. §§ 136(u) and 136j, to its crops, including Benlate, Captan 50, Diazinon 500–AG, Dithane F–45, Kocide 101, Kocide LF, Malathion 25%, Microsperse Wettable Sulphur, Neemix, Soluble Oil Spray, Supracide 2–E, and Tenn–Cop 5E. Of these pesticides, Captan

---

1. Defendants protest that Mr. Avshalom Lubin is not the managing or a general partner of Tropical Fruit. (Docket No. 51, p. 2, ¶ 1). Docket No. 51, Exhibit 1 is a Spanish language document and is excluded from the Court's consideration because the document has not been translated as required by Rule 108.1 and global reference to the 23 page document contravenes Rule 311.12. *See Ayala–Gerena v. Bristol Myers–Squibb. Co.,* 95 F.3d 86, 95 (1st Cir.1996); *Stepanischen v. Merchants Despatch Transp. Corp.,* 722 F.2d 922, 930–31 (1st Cir.1983); *Dominguez v. Eli Lilly & Co.,* 958 F.Supp. 721, 727 (D.P.R. 1997). However, Tropical Fruit's response to the USA's second set of interrogatories and request for production of documents response to interrogatories shows that Tropical Fruit, S.E., consists of three partners: Mr. Pedro

Toledo; Mr. César Otero; and Grand Atrium. (Docket No. 51, Exhibit 3, Response # 20). On the other hand, the Interim Order on Consent was signed by Lubin in his capacity as "President and General Partner, TROPICAL FRUIT, S.E. and individually." (Docket No. 2). Therefore, there exists a issue of fact as to whether Mr. Avshalom Lubin is the managing or a general partner of Tropical Fruit.

2. Although Defendants argue that Pedro Toledo Gonzalez is the managing partner of Tropical Fruit, (Docket No. 51, p. 2, ¶ 1), the Defendants have failed to proffer any evidence to support their contention and have not supplemented the record.

50, Diazinon 500–AG, Dithane F–45, Kocide 101, Kocide LF, Malathion 25%, Supracide 2E, and Tenn–Cop 5E are, or contain, hazardous substances as that term is defined by Section 101(14) of CERCLA. *See* 42 U.S.C. § 9601(14). Pursuant to this Court's Order dated November 19, 1997, Tropical Fruit applies pesticides in Farm sectors 1 through 8 by either Tower Sprayer or hand spraying. Allegedly, pesticide applications conducted with both the Smart Sprayer and the Tower Sprayer have resulted in numerous incidents of pesticides drifting into the community. "Drift" is the offsite movement of pesticide droplets, particles, and vapor.

An Interim Order on Consent ("IOC") was filed by the parties on March 26, 1997. (Docket No. 2). The IOC explicitly restricts Tropical Fruit's application of pesticides to intervals when the wind speed is low (e.g., sectors 1–8—between 2 mph and 6 mph; all other sectors—between 2 mph and 10 mph), thereby reducing the possibility of pesticides drifting and prohibits Defendants from operating in a manner that results in drift of pesticides or hazardous substances (collectively, "Pesticides") that drift beyond the boundaries of the Farm. Despite the IOC, the USA avers that Defendants violated its terms.

Subsequently, the Court entered a modifying order restricting application of pesticides allowing only hand-held sprayer application, after EPA approval, and ordering Defendants to show cause why the Court's modified order should not remain in force. (Docket No. 8). Further, Tropical Fruit was to show cause why the Court should not impose a penalty of $585,000.00 pursuant to the IOC. (Docket No. 8); *see also* (Docket No. 2, ¶ 24). The Court conducted an evidentiary hearing on its Order to Show Cause, on November 13, 1997, at which time the parties presented evidence, including testimony of expert witnesses. (Docket No. 16). The minutes of that hearing state that "[t]he Court's Order remains in effect, no pesticide or chemical [except fertilizers] shall

be sprayed unless there is an agreement by the parties." *See id.* A second evidentiary hearing on the Order to Show Cause was held on November 19, 1997, whereof the Court heard numerous fact witnesses. (Docket Nos. 17 & 21).

Since then, the Court has allowed Tropical Fruit to resume utilizing with certain application, location, and notification to the government parameters the following pesticides: Microsperse Wettable Sulfur (Docket No. 19); Benlate and Kocide 101 (Docket No. 19); Neemix and Soluble Oil Spray (Docket No. 27); Gowan Malathion 8 (Docket No. 30); Ferbam (Docket No. 37); and Provado 1.6 Flowable (Docket No. 56).

## II. SUMMARY JUDGMENT STANDARD

A court should grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact ..." FED.R.CIV.P. 56(c). "In applying this formulation, a fact is 'material' if it potentially affects the outcome of the case," *Vega–Rodriguez v. Puerto Rico Tel. Co.,* 110 F.3d 174, 178 (1st Cir.1997), and "'genuine' if a reasonable factfinder, examining the evidence and drawing all reasonable inferences helpful to the party resisting summary judgment, could resolve the dispute in that party's favor." *Cortes–Irizarry v. Corporacion Insular,* 111 F.3d 184, 187 (1st Cir.1997). The court should "'look at the record ... in the light most favorable to ... the party opposing ... the motion' ... [and] indulge all inferences favorable to the party opposing the motion." *Hahn v. Sargent,* 523 F.2d 461, 464 (1st Cir.1975) (quoting *Poller v. Columbia Broadcasting System,* 368 U.S. 464, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962)) (citations omitted). However, the nonmovant must "present definite, competent evidence to rebut the motion." *Mesnick v. General Elec. Co.,* 950 F.2d 816, 822 (1st Cir.1991), *cert. de-*

*nied,* 504 U.S. 985, 112 S.Ct. 2965, 119 L.Ed.2d 586 (1992). "The court may consider any material that would be admissible or usable at trial." *See* 10A CHARLES ALAN WRIGHT, ARTHUR R. MILLER AND MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE § 2721, at 361 (3d ed.1998). "But the court should do no more than this in reviewing the quality of the evidence. Most critically, it must never 'weigh the evidence and determine the truth of the matter ....'" *Lipsett ·v. University of P.R.,* 864 F.2d 881, 895 (1st Cir.1988) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986)). Furthermore, "[n]o credibility assessment may be resolved in favor of the party seeking summary judgment." *Woodman v. Haemonetics Corp.,* 51 F.3d 1087, 1091 (1st Cir.1995) (citations omitted). "If, after this canvassing of the material presented, the district court finds that some genuine factual issue remains in the case, whose resolution one way or another could affect its outcome, the court must deny the motion." *Lipsett v. University of P.R.,* 864 F.2d at 895 (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 242, 106 S.Ct. at 2505).

"We believe that summary judgment procedures should be used sparingly ... where the issues of motive and intent play leading roles ... It is only when the witnesses are present and subject to cross-examination that their credibility and the weight to be given their testimony can be appraised. Trial by affidavit is no substitute for trial by jury which so long has been the hallmark of 'even handed justice.'" *Poller v. Columbia Broad. Sys.,* 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458 (1962); *cf. Pullman–Standard v. Swint,* 456 U.S. 273, 288–90, 102 S.Ct. 1781, 1790–1791, 72 L.Ed.2d 66 (1982) (discriminatory intent is a factual matter for the trier of fact); *see also Coll v. PB Diagnostic Sys., Inc.,* 50 F.3d 1115, 1121

(1st Cir.1995); *Oliver v. Digital Equip. Corp.,* 846 F.2d 103, 107 (1st Cir.1988); *Lipsett v. University of P.R.,* 864 F.2d at 895. "Under such circumstances, jury judgments about credibility are typically thought to be of special importance." *Stepanischen v. Merchants Despatch Transp. Corp.,* 722 F.2d 922, 928 (1st Cir. 1983). However, "even in cases where elusive concepts such as motive or intent are at issue, summary judgment may be appropriate if the nonmoving party rests merely upon conclusory allegations, improbable inferences, and unsupported speculation." *Ayala–Gerena v. Bristol Myers–Squibb Co.,* 95 F.3d 86, 95 (1st Cir.1996).

## III. DISCUSSION

The USA brought four separate claims pursuant to FIFRA (Section 12(a)(2)(G) of FIFRA, 7 U.S.C. § 136j(a)(2)(G)) and a claim under CERCLA (Section 106(a) of CERCLA, 42 U.S.C. § 9606(a)) against Defendants. The Court will first tackle the motions pertaining to the FIFRA claims and then turn its attention to the CERCLA claim. Before embarking on such sojourn, the Court notes that the parties statements of fact have been appended for quick reference to this Opinion and Order as exhibits: USA's Exhibit A and Tropical Fruit's Exhibits B & C.

### A. FIFRA.

■ The USA avers that the undisputed material facts establish each of the elements of Tropical Fruit, S.E.'s, and its general partners', Cesar Otero Acevedo, and Pedro Toledo Gonzalez,[3] liability under Section 12(a)(2)(G) of FIFRA. *See* 7 U.S.C. § 136j(a)(2)(G). The Court holds that Avshalom Lubin is not liable under FIFRA, at this juncture for the reasons as set-forth in Section III.B.1. Covered Persons (under CERCLA) infra. Thus, the Court has injunctive power, pursuant to

---

**3.** (s) Person

The term "person" means any individual, partnership, association, corporation, or any organized group of persons whether incorporated or not.

7 U.S.C. § 136(s).

Section 16(c) of FIFRA, 7 U.S.C. § 136n to ensure Tropical Fruit desists its unlawful practices. The USA points to 7 U.S.C. § 136a, the statutory framework for registration of pesticides.[4] Specifically, the USA contents that Tropical Fruit has used registered pesticides in manners inconsistent with labeling.[5] *See* 7 U.S.C.A. § 136j(a)(2)(G)("(2) It shall be unlawful for any person—. . . (G) to use any registered pesticide in a manner inconsistent with its labeling . . .").

First, the Court acknowledges that it is "vested with jurisdiction specifically to en-

force, and to prevent and restrain violations of [FIFRA]." 7 U.S.C. § 136n(c). Next, there is ample evidence in the record to demonstrate that Defendants violated the requirements of FIFRA. *See* 7 U.S.C. § 136 *et seq.*

The labels for the pesticides Benlate, Diazinon500–AG, Dithane F–45, Kocide 101, Soluble Oil Spray, Supracide2E, Tenn–Cop 5E, Microsperse Wettable Sulphur, and Neemix, contain specific use restrictions regarding application methods, application rates, and target crops.

---

4. (u) Pesticide

The term "pesticide" means (1) any substance or mixture of substances intended for preventing, destroying, repelling, or mitigating any pest, (2) any substance or mixture of substances intended for use as a plant regulator, defoliant, or desiccant, and (3) any nitrogen stabilizer, except that the term "pesticide" shall not include any article that is a "new animal drug" within the meaning of section 321(w) of Title 21, that has been determined by the Secretary of Health and Human Services not to be a new animal drug by a regulation establishing conditions of use for the article, or that is an animal feed within the meaning of section 321(x) of Title 21 bearing or containing a new animal drug. The term "pesticide" does not include liquid chemical sterilant products (including any sterilant or subordinate disinfectant claims on such products) for use on a critical or semi-critical device, as defined in section 321 of Title 21. For purposes of the preceding sentence, the term "critical device" includes any device which is introduced directly into the human body, either into or in contact with the bloodstream or normally sterile areas of the body and the term "semi-critical device" includes any device which contacts intact mucous membranes but which does not ordinarily penetrate the blood barrier or otherwise enter normally sterile areas of the body.
7 U.S.C. § 136(u); *see also* 7 U.S.C. § 136(t)—
(t) Pest
The term "pest" means (1) any insect, rodent, nematode, fungus, weed, or (2) any other form of terrestrial or aquatic plant or animal life or virus, bacteria, or other micro-organism (except viruses, bacteria, or other micro-organisms on or in living man or other living animals) which the Administrator declares to be a pest under section 136w(c)(1) of this title.
7 U.S.C. § 136(t).

5. (ee) To use any registered pesticide in a manner inconsistent with its labeling

The term "to use any registered pesticide in a manner inconsistent with its labeling" means to use any registered pesticide in a manner not permitted by the labeling, except that the term shall not include (1) applying a pesticide at any dosage, concentration, or frequency less than that specified on the labeling unless the labeling specifically prohibits deviation from the specified dosage, concentration, or frequency, (2) applying a pesticide against any target pest not specified on the labeling if the application is to the crop, animal, or site specified on the labeling, unless the Administrator has required that the labeling specifically state that the pesticide may be used only for the pests specified on the labeling after the Administrator has determined that the use of the pesticide against other pests would cause an unreasonable adverse effect on the environment, (3) employing any method of application not prohibited by the labeling unless the labeling specifically states that the product may be applied only by the methods specified on the labeling, (4) mixing a pesticide or pesticides with a fertilizer when such mixture is not prohibited by the labeling, (5) any use of a pesticide in conformance with section 136c, 136p, or 136v of this title, or (6) any use of a pesticide in a manner that the Administrator determines to be consistent with the purposes of this subchapter. After March 31, 1979, the term shall not include the use of a pesticide for agricultural or forestry purposes at a dilution less than label dosage unless before or after that date the Administrator issues a regulation or advisory opinion consistent with the study provided for in section 27(b) of the Federal Pesticide Act of 1978, which regulation or advisory opinion specifically requires the use of definite amounts of dilution.
7 U.S.C. § 136(ee).

(Docket No. 42, Attachment 4); (Docket No. 51, p. 3, ¶ 4); (Docket No. 51, Exhibit 3, Annex # 1). Again, "to use any registered pesticide in a manner inconsistent with its labeling" is a violation of FIFRA. 7 U.S.C. § 136j(a)(2)(G).

### 1. Label Requirements Regarding Prevention of Pesticide Drift

The labels for the pesticides Benlate, Kocide 101, Soluble Oil Spray, Supracide–2E, Tenn–Cop SE, Microsperse Wettable Sulphur and Neemix, each state in part: "[d]o not apply this product in a way that will contact workers or other persons either directly or through drift." (Docket No. 42, SOF 16 & Attachment 4); (Docket No. 51, p. 3, ¶ 6). The government asserts that Tropical Fruit repeatedly violated the pesticide label requirements regarding prevention of pesticide drift. That is, "[t]here is always off-site drift of some amount of pesticides when pesticides are applied with an air blast sprayer at the Tropical Fruit Farm." (Docket No. 42, SOF 18 & Attachment 7); *see also* (Docket No. 42, SOF 17 & Attachments 5 & 6).

A dozen incidents of alleged pesticides drift from Tropical Fruit's farm into the community occurred on: 1) June 25, 1996 (Docket No. 42, Attachments 8–9); 2) July 1, 1996 (Attachments 8, 10–11); 3) July 2, 1996 (Attachments 8, 10, 12); 4) July 16, 1996 (Attachments 8, 10); 5) February 4, 1997 (Attachments 13–22); 6) March 3, 1997 (Attachments 8, 14–15, 18–19, 23); 7) March 4, 1997 (Attachments 8, 14–15, 19, 23); 8) March 5, 1997 (Attachments 8, 14–15, 19, 21, 23); 9) March 6, 1997 (Attachments 8, 14–15, 19, 21, 23–24); 10) March 20, 1997 (Attachments 8, 25–26); 11) May 21, 1997 (Attachments 8, 27); and 12) October 21, 1997 (Attachments 28–35). (Docket No. 42, SOF 19–43).

In the wake of the government's evidence consisting of declarations, courtroom testimony, a videotape, and Tropical Fruit's own pesticide application records, Tropical Fruit proffered three exhibits. The first is a Spanish language document for establishment of a special partnership and is irrelevant to the current discussion. (Docket No. 51, Exhibit 1); *see also* Footnote 1 infra. The second is a declaration under penalty of perjury from an expert in Agricultural Spray Technology regarding the sprayers utilized by the farm, (i.e., Smart Sprayer and Tower Sprayer). (Docket No. 51, Exhibit 2). However, the declaration is also irrelevant to rebutting the evidence proffered regarding Tropical Fruit's allowance of pesticides to drift on the aforementioned dates. The third exhibit is Tropical Fruit's response to the USA's second set of interrogatories and request for production of documents and because the exhibit does not address the issue of pesticide drift nor FIFRA compliance it is of limited probative value to the controversy at this stage. (Docket No. 51, Exhibit 3).

Additionally, Tropical Fruit contends that summary judgment is warranted because the USA's evidence is insufficient and objects to specific pieces of evidence. (Docket No. 50). One objection easily disposed of is the alleged insufficiency of unsworn declarations under penalty of perjury because 28 U.S.C. § 1746 specifically allows for the declarations to be of the same force and effect as affidavits. Another argument easily dispensed with is that the labels of the pesticides include instructions to minimize or mitigate drift which Tropical Fruit attempted or did comply with. Succinctly, at the summary judgment juncture, the Defendants must proffer proof to sustain its contentions and the record is devoid of such required evidence. William C. Hunt's declaration is wholly inadequate to create a genuine issue as to Tropical Fruit's compliance with the labels' drift minimization instructions. (Docket No. 51, Exhibit 2).

The Court now examines the more specific objections to Docket No. 42, Attachments 5–35. (Docket No. 42, SOF 17–43). The Court begins with Docket No. 42, SOF 19 & 20, regarding a pesticides drift on June 25, 1996. Defendants do not con-

test that their records are accurate that "On June 25, 1996, Defendants applied Kocide 101 and Supracide 2E in Farm sectors 2–4–6 between approximately 5:00 p.m. and 1:00 a.m." (Docket No. 42, SOF 19, Attachment 8). Tropical Fruit argues that the statement, "As a result of Defendants' June 25, 1996 application of pesticides, pesticides migrated beyond the boundary of the Tropical Fruit Farm," (Docket No. 42, SOF 20), is not supported by paragraphs 7 and 8 of the March 13, 1997 declaration of Palmira Rodríguez. (Docket No. 42, Attachment 9 ¶¶ 7–8). Defendants argue that Palmira Rodríguez statement does not state the pesticides Kocide 101 and Supracide 2E were the substances smelled, that only a gas was smelled, the nature of the gas nor can the gas' origin be traced to pesticide spraying, and the smelling was not time specific. The statements in question are:

"7. The following day, June 25, 1996, while I was in my bedroom with my two children, I smelled a very strong odor, like gas. That evening, at about 6:00 p.m., while Tropical Fruit continued to spray pesticides, I smelled an odor that was very strong, I took my children inside, closed the door of my bedroom, an turned the air conditioner on.

8. My youngest son started to cough immediately, and I noticed his eyes were teary. I immediately gave him respiratory therapy with the machine."

(Docket No. 42, Attachment 9 ¶¶ 7–8).

The Court holds Defendants argument is utterly without force. First, reading the two paragraphs in the context of Palmira Rodríguez' whole statement their meaning becomes crystal clear. Palmira Rodríguez was relaying her first (of numerous) experiences with pesticides coming unto property from Tropical Fruit's farm in January of 1996. (Docket No. 42, Attachment 9). Her statement reveals that at 6:00 p.m. on June 25, 1996, while Tropical Fruit sprayed pesticides she smelled a very strong odor. (Docket No. 42, Attachment 9 ¶ 7). Second, the record is devoid of any

evidence to rebut Palmira Rodríguez' statement. *See Mesnick v. General Elec. Co.,* 950 F.2d at 822 (Nonmovant must "present definite, competent evidence to rebut the motion."). Palmira Rodríguez' statement when combined with the admitted fact that Tropical Fruit sprayed the pesticides that evening direct a finding that on June 25, 1996, when Defendants applied Kocide 101 and Supracide 2E in the farm the pesticides entered Palmira Rodríguez' premises. *See Ayala–Gerena v. Bristol Myers–Squibb Co.,* 95 F.3d at 95 ("[S]ummary judgment may be appropriate if the nonmoving party rests merely upon conclusory allegations, improbable inferences, and unsupported speculation.").

Another incident of pesticides drift from Tropical Fruit's farm onto adjacent properties occurred on July 16, 1997. *Compare* (Docket No. 42, Attachments 8 & 10 ¶¶ 15–16, SOF 26–27), *with* (Docket No. 51, p. 6 ¶¶ 14–15). The Court need go no further. The record overwhelming supports that Tropical Fruit is liable for violations of FIFRA for using registered pesticides in a manner inconsistent with their labeling by allowing the pesticides to drift off of the farm onto adjacent properties. *See* 7 U.S.C. § 136j(a)(2)(G).

## 2. Label Requirements Regarding Authorized Target Crops

The label for the pesticide Supracide 2–E with reference to mangoes states, in pertinent part to "[a]pply during the postharvest to bloom stage ..." *Compare* (Docket No. 42, Attachment 4, SOF 46), *with* (Docket No. 51, p. 9 ¶ 33). Nevertheless, on July 2, 1996, Defendants applied Supracide 2–E to mango trees while mangoes were present on the trees. *Compare* (Docket No. 42, Attachments 8, 10 at ¶ 12, 12, SOF 47), *with* (Docket No. 51, pp. 9–10 ¶ 34); *see Mesnick v. General Elec. Co.,* 950 F.2d at 822 (Nonmovant must "present definite, competent evidence to rebut the motion."). Thus, that application was inconsistent with the pesticides labeling and

constitutes a violation of FIFRA. *See* 7 U.S.C. § 136j(a)(2)(G).

The label for the pesticide Dithane F–45 does not authorize its use on mangoes. (Docket No. 42, Attachment 4, SOF 44); (Docket No. 51, p. 9 ¶ 31). Notwithstanding, on March 5, 1996, Defendants applied Dithane F–45 to mangoes. *Compare* (Docket No. 42, Attachments 8, 10 at ¶ 3, SOF 45), *with* (Docket No. 51, p. 9 ¶ 32). That application constitutes a violation of FIFRA. *See* 7 U.S.C. § 136j(a)(2)(G); 7 U.S.C. § 136(ee) ("The term 'to use any registered pesticide in a manner inconsistent with its labeling' means to use any registered pesticide in a manner not permitted by the labeling …").

### 3. Label Requirements Regarding Worker Protection

The EPA has issued worker protection standard regulations that require agricultural employers to take specified measures to prevent the exposure of workers to pesticides. *See* 40 C.F.R. §§ 156.200 *et seq.* & 170.1 *et seq.;* 7 U.S.C. § 136w(a)(1). The labels for the pesticides Benlate, Dithane F–45, Kocide 101, Soluble Oil Spray, and Supracide 2–E require that they be used only in accordance with the worker protection standards appearing in 40 C.F.R. Part 170. (Docket No. 42, Attachment 4, 39—Complaint ¶ 29 & Answer ¶ 20, SOF 48); (Docket No. 51, p. 10 ¶ 35).

 First, the USA urges that Tropical Fruit has violated EPA regulations 40 C.F.R. § 170.120(b) & (c), regarding notification to farm workers of pesticides applications. The Court disagrees. 40 C.F.R. § 170.120(b) reads as follows:

(b) *Notification to workers on farms, in nurseries, or in forests of pesticide applications.* The agricultural employer shall notify workers of any pesticide application on the farm or in the nursery or forest in accordance with this paragraph.

(1) If the pesticide product labeling has a statement requiring both the posting of treated areas and oral notification to workers, the agricultural employer shall post signs in accordance with paragraph (c) of this section and shall provide oral notification of the application to the worker in accordance with paragraph (d) of this section.

(2) For any pesticide other than those for which the labeling requires both posting and oral notification of applications, the agricultural employer shall give notice of the application to the worker either by the posting of warning signs in accordance with paragraph (c) of this section or orally in accordance with paragraph (d) of this section, and shall inform the workers as to which method of notification is in effect.

(3) Notice need not be given to a worker if the agricultural employer can assure that one of the following is met:

(i) From the start of the application until the end of the application and during any restricted-entry interval, the worker will not enter, work in, remain in, or pass through on foot the treated area or any area within ¼ mile of the treated area; or

(ii) The worker applied (or supervised the application of) the pesticide for which the notice is intended and is aware of all information required by (d)(1) through (3) of this section.

40 C.F.R. § 170.120(b). None of the labels for the pesticides Benlate, Dithane F–45, Kocide 101, Soluble Oil Spray, and Supracide 2–E require both posting and oral notification of applications. (Docket No. 42, Attachment 4). Wherefore, notification, pursuant to 40 C.F.R. § 170.120(b)(2), can be accomplished by either posting or oral means alone. Although, the government has proffered evidence that posting was not performed in accordance with § 170.120(c), (Docket No. 42, Attachments 4, 8, 10, 12, 36–38, SOF 48, 50, 52–53, 55), no evidence has been presented showing employees were not orally notified. *See* 40 C.F.R. § 170.120(b)(2), (3) & (d). The Court may not infer at the summary judg-

█ stage that oral notification was not provided. *See Hahn v. Sargent*, 523 F.2d at 464 (The court should "indulge all inferences favorable to the party opposing the motion."). Therefore, summary judgment is **DENIED** as to failure to notify farm employees of pesticides applications.

█ However, the evidence on the record does establish that Tropical Fruit failed on numerous occasions (March 5, March 25, May 13, and July 2, 1996) to post pesticide safety information in an area where workers or pesticides handlers could readily see and read the information as required by FIFRA regulations. *Compare* (Docket No. 42, Attachments 4, 8, 10 at ¶¶ 4, 7–8, 11, & 13, SOF 48, 50, 52–53, 55), *with* (Docket No. 51, pp. 10–11 ¶¶ 35, 37, 39–41); *see* 40 C.F.R. §§ 170.135(a) & 170.235(a). Additionally, on these same occasions, Tropical Fruit did not provide a decontamination area for washing off pesticides for pesticide handlers. *See id.;* 40 C.F.R. § 170.250. Lastly, on March 5 and May 13, 1996, the pesticide handlers, including persons who mix pesticides, did not wear personal protective equipment ("PPE") as required by the labels for the pesticides Benlate, Dithane F–45, and Kocide 101. *Compare* (Docket No. 42, Attachments 4; 8; 10 at ¶¶ 4, 8; 36; 38; 39—Complaint ¶ 33 & Answer ¶ 20, SOF 49, 51, 54), *with* (Docket No. 51, pp. 10–11 ¶¶ 35, 37, 39–41); *see* 7 U.S.C. § 136j(a)(2)(G).

**4. Label Requirements Regarding Pesticide Disposal**

█ The label for the pesticide Diazinon 500–AG contains instructions for plastic container disposal, which states in pertinent part: "[t]riple rinse (or equivalent). Then puncture and dispose of in a sanitary landfill, or incinerator, or burn." (Docket No. 42, Attachment 4, SOF 56); (Docket No. 51, p. 9 ¶ 42). Notwithstanding these requirements, on March 5, 1996, Defendants failed to triple rinse, puncture, or incinerate or dispose in a landfill, used containers of Diazinon 500–AG. *Compare*

(Docket No. 42, Attachments 10 at ¶ 5, 36 SOF 57), *with* (Docket No. 51, p. 9 ¶ 43). By failing to comply with the pesticide label requirements regarding disposal practices, Defendants have violated FIFRA. *See* 7 U.S.C. § 136j(a)(2)(G).

**B. CERCLA.**

The USA also seeks summary judgment for liability under the fifth claim which alleges Defendants violated Section 106(a) of CERCLA, 42 U.S.C. § 9606(a) by failing to comply with the EPA Order, which prevented Tropical Fruit from spraying pesticides in a manner that allowed the pesticides to drift onto adjacent properties. Tropical Fruit argues that the Court must dismiss the USA's CERCLA claim because: (1) CERCLA cannot be applied to the facts of this case as a matter of law because the application of pesticides is exempted from any liability under CERCLA; (2) the Government's case under CERCLA is devoid of essential elements such as evidence of a "disposal" or that there is a "facility" as both terms are defined by law. (Docket No. 48, p. 4). Tropical Fruit contends that the pesticide exemption under CERCLA, 42 U.S.C. § 9607(i) not only requires denial of the USA's motion for summary judgment, but in fact mandates that the USA's claim against Defendants for violation of CERCLA be dismissed.

**1. EPA Order & CERCLA**

The government asserts that Tropical Fruit when spraying pesticides would frequently spray in such a manner as to cause the pesticides to unlawfully drift onto adjacent properties. In order to totally quell Tropical Fruit from allowing the drift to continue to occur, the EPA, pursuant to CERCLA, issued the EPA Order, compelling Tropical Fruit to "immediately cease and desist from spraying Malathion, Supracide–2E, Captan 50, Dithane F–45, and any other materials that contain or are hazardous substances, at Respondents' farm in such a manner that the pesticides, fungicides or other materials may drift or

otherwise migrate beyond the boundaries of Respondents' farm." (Docket No. 42, Attachment 2—Exhibit 2 ¶ 32); *see also* 42 U.S.C. § 9606(a). The EPA Order is predicated upon the determinations that the "there may be an imminent and substantial endangerment to the public health or welfare or the environment because of an actual or threatened release of a hazardous substance from" Tropical Fruit's farm. 42 U.S.C. § 9606(a); *see* (Docket No. 42, Attachment 2—Exhibit 2 ¶¶ 30-31). The USA maintains that Tropical Fruit nevertheless continued to spray pesticides allowing drift on at least seven (7) separate occasions in contravention of the EPA Order. The USA filed the instant suit on March 26, 1997. (Docket No. 1). The Court notes that the Respondents in the EPA Order are the same named Defendants in this case.

Clearly, the EPA has the power, delegated by the President, to promulgate orders pursuant to 42 U.S.C. § 9606(a).[6] *See U.S. v. Reilly Tar & Chemical Corp.,* 546 F.Supp. 1100, 1112–1113 (D.Minn. 1982); *see also* 42 U.S.C. § 9606(c).[7] Equally clear, the Court has the power to enforce the EPA Order through injunctive relief, *see* 42 U.S.C. § 9606(a), and to fine violators. *See* 42 U.S.C. § 9606;[8] *United*

6. § 9606. Abatement actions

(a) Maintenance, jurisdiction, etc.
In addition to any other action taken by a State or local government, when the President determines that there may be an imminent and substantial endangerment to the public health or welfare or the environment because of an actual or threatened release of a hazardous substance from a facility, he may require the Attorney General of the United States to secure such relief as may be necessary to abate such danger or threat, and the district court of the United States in the district in which the threat occurs shall have jurisdiction to grant such relief as the public interest and the equities of the case may require. The President may also, after notice to the affected State, take other action under this section including, but not limited to, issuing such orders as may be necessary to protect public health and welfare and the environment.
42 U.S.C. § 9606(a).

7. § 9606. Abatement actions

. . .

(c) Guidelines for using imminent hazard, enforcement, and emergency response authorities; promulgation by Administrator of EPA, scope, etc.
Within one hundred and eighty days after December 11, 1980, the Administrator of the Environmental Protection Agency shall, after consultation with the Attorney General, establish and publish guidelines for using the imminent hazard, enforcement, and emergency response authorities of this section and other existing statutes administered by the Administrator of the Environmental Protection Agency to effectuate the responsibilities and powers created by this chapter. Such guidelines shall to the extent practicable be consistent with the national hazardous substance response plan, and shall include, at a minimum, the assignment of responsibility for coordinating response actions with the issuance of administrative orders, enforcement of standards and permits, the gathering of information, and other imminent hazard and emergency powers authorized by (1) sections 1321(c)(2), 1318, 1319, and 1364(a) of Title 33, (2) sections 6927, 6928, 6934, and 6973 of this title, (3) sections 300j–4 and 300i of this title, (4) sections 7413, 7414, and 7603 of this title, and (5) section 2606 of Title 15.
42 U.S.C. § 9606(c).

8. § 9606. Abatement actions

. . .

(b) Fines; reimbursement
(1) Any person who, without sufficient cause, willfully violates, or fails or refuses to comply with, any order of the President under subsection (a) of this section may, in an action brought in the appropriate United States district court to enforce such order, be fined not more than $25,000 for each day in which such violation occurs or such failure to comply continues.
(2)(A) Any person who receives and complies with the terms of any order issued under subsection (a) of this section may, within 60 days after completion of the required action, petition the President for reimbursement from the Fund for the reasonable costs of such action, plus interest. Any interest payable under this paragraph shall accrue on the amounts expended from the date of expenditure at the same rate as specified for interest on investments of the Hazardous Substance Superfund established under subchapter A of chapter 98 of Title 26.
(B) If the President refuses to grant all or part of a petition made under this paragraph,

*States v. Conservation Chemical Co.,* 619 F.Supp. 162, 192 (D.C.Mo.1985). Also, the USA seeks reimbursement from Tropical Fruit for response costs. *See* 42 U.S.C. § 9601(25); *In re Hemingway Transport, Inc.,* 993 F.2d 915 (1st Cir.1993); *United States v. Ottati & Goss, Inc.,* 900 F.2d 429 (1st Cir.1990); *Dedham Water Co. v. Cumberland Farms Dairy, Inc.,* 889 F.2d 1146 (1st Cir.1989); *see also* (Docket No. 52, Exhibit 1). As the USA's motion for summary judgment is limited to liability the assessment of relief is deferred.

This Court must enforce the EPA Order unless the EPA's decision was "arbitrary and capricious or otherwise not in accordance with the law." 42 U.S.C. § 9613(j)(2). Recently in *Penobscot Air Servs. v. F.A.A.,* 164 F.3d 713, 720 (1st Cir.1999) the court reiterated the standard as follows:

> Although "the ultimate standard of review is a narrow one," the court must undertake "a thorough, probing, in-depth review" and a "searching and careful" inquiry into the record. *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 415–16, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). In order for an agency decision to pass muster under the APA's "arbitrary and capricious" test, the reviewing court must determine that the decision is "rational," *Citizens Awareness Network,* 59 F.3d at 290, that it "make[s] ... sense," *Puerto Rico Sun Oil,* 8 F.3d at 77. Only by "carefully reviewing the record and satisfying [it-

self] that the agency has made a reasoned decision" can the court "ensure that agency decisions are founded on a reasoned evaluation of the relevant factors." *Marsh[ v. Oregon Natural Resources Council],* 490 U.S. [360] at 378, 109 S.Ct. 1851[, 104 L.Ed.2d 377 (1989)] (internal quotation marks omitted).

■ When a District Court examines an agency decision under the arbitrary and capricious standard, it must determine "whether the [agency] has considered the relevant factors and articulated a rational connection between the facts found and the choice made." *Baltimore Gas & Elec. v. Natural Resources Defense Council,* 462 U.S. 87, 105, 103 S.Ct. 2246, 2256, 76 L.Ed.2d 437 (1983). Should the agency have considered the relevant factors and should the agency have not made a clear error in judgment, then the decision may not be cataloged by the reviewing court as arbitrary or capricious. *See Motor Vehicle Mfrs. Ass'n. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 2866–67, 77 L.Ed.2d 443 (1983); *Dubois v. United States Dept. of Agriculture,* 102 F.3d 1273, 1285 (1st Cir.1996); *United States v. Hernandez,* 979 F.Supp. at 76. Finally, although the standard is highly differential, "it is not a rubber stamp." *Dubois v. United States Dept. of Agriculture,* 102 F.3d 1273, 1285 (1st Cir.1996).

Before diving headlong into discussion, the Court notes that the succeeding analysis in conjunction with the EPA Order, *see*

---

the petitioner may within 30 days of receipt of such refusal file an action against the President in the appropriate United States district court seeking reimbursement from the Fund. (C) Except as provided in subparagraph (D), to obtain reimbursement, the petitioner shall establish by a preponderance of the evidence that it is not liable for response costs under section 9607(a) of this title and that costs for which it seeks reimbursement are reasonable in light of the action required by the relevant order.

(D) A petitioner who is liable for response costs under section 9607(a) of this title may also recover its reasonable costs of response to the extent that it can demonstrate, on the administrative record, that the President's decision in selecting the response action ordered was arbitrary and capricious or was otherwise not in accordance with law. Reimbursement awarded under this subparagraph shall include all reasonable response costs incurred by the petitioner pursuant to the portions of the order found to be arbitrary and capricious or otherwise not in accordance with law.

(E) Reimbursement awarded by a court under subparagraph (C) or (D) may include appropriate costs, fees, and other expenses in accordance with subsections (a) and (d) of section 2412 of Title 28.

42 U.S.C. § 9606(b).

(Docket No. 42, Attachment 2—Exhibit 2 ¶¶ 8–29), when subjected to the "arbitrary and capricious" standard, substantiates that the EPA Order's determination of "imminent and substantial endangerment to the public health or welfare or the environment because of an actual or threatened release of a hazardous substance from" Tropical Fruit's farm is sustained. (Docket No. 42, Attachment 2—Exhibit 2 ¶¶ 30–31).

### Covered Person

The Court holds that on the summary judgment record, Tropical Fruit, S.E., a Puerto Rico special partnership, is a potentially responsible party or covered person under 42 U.S.C. § 9607(a)(1)–(4). *See* 42 U.S.C. § 9607(a); 42 U.S.C. § 9601(20)(A) ("owner or operator"); 42 U.S.C. § 9601(21) ("'person' means an individual, firm, corporation, association, partnership, ..."); *Acushnet Co. v. Mohasco Corp.*, 191 F.3d 69, 74 (1st Cir.1999); *Hemingway Transport, Inc.*, 993 F.2d at 931 ("Covered persons" includes current owners and operators of the facility.); · *see also* (Docket No. 42, SOF 1–2). Because Tropical Fruit, S.E. is a special partnership duly organized pursuant to Puerto Rico law, imposing liability on the partners Avshalom Lubin, Cesar Otero Acevedo, and Pedro Toledo Gonzalez is ordinarily not as clear. (Docket No. 42, Exhibit 3 p. 14–15); *see also* (Docket No. 42, SOF 4–6). *See Redwing Carriers, Inc. v. Saraland Apartments*, 94 F.3d 1489, 1501 (11th Cir. 1996) (Liability of limited partner under CERCLA determined by state law). However, Cesar Otero Acevedo and Pedro Toledo Gonzalez concede that they are "persons" under § 9601(21), thereby sim-

plifying the process for those two. Further, as discussed in Footnote 1 supra, the determination of whether Mr. Avshalom Lubin is the managing or even a general partner of Tropical Fruit is a fact in controversy. The Court also recognizes a more salient point regarding this issue. The Court very briefly explains.

Providing the partners all possible favorable inferences adduced from the summary judgment record, as the Court must in summary judgment mode, *see Hahn v. Sargent*, 523 F.2d at 464, "Tropical Fruit, S.P. owns" the farm. (Docket No. 42, SOF 2). Thus, at this summary judgment juncture, the partners are not "owners" within the meaning of CERCLA. *See Redwing Carriers, Inc. v. Saraland Apartments*, 94 F.3d at 1503.

 The analysis reduces to the question of whether the partner, Avshalom Lubin, is an "operator" of the farm. *See Redwing Carriers, Inc. v. Saraland Apartments*, 94 F.3d at 1505; *United States v. Kayser–Roth Corp.*, 910 F.2d 24 (1st Cir. 1990). "[The USA] must demonstrate the [Tropical Fruit, S.E.] partners either (1) actually participated in operating the Site or in the activities resulting in the disposal or ·hazardous substances, or (2) actually exercised control over, or [were] otherwise intimately involved in the operations of [Tropical Fruit, S.E.]." *Id.; see generally Efron v. Embassy Suites (Puerto Rico), Inc.*, 47 F.Supp.2d 200, 207–208 (D.P.R. 1999)[9]. Thus, to find Avshalom Lubin to be a "covered person" the USA may have to address the *Redwing* test to determine if Mr. Lubin is an "operator" under CERCLA. *See Redwing Carriers, Inc. v. Sara-*

---

9. Irrefutably, under Puerto Rico law a corporation has a distinct separate legal personality from its shareholders. "Courts have applied the rationale of derivative suits to limited partnerships along with corporations. Indeed, special partnerships are persons under Puerto Rico law with the capacity to sue and be sued, [P.R.Laws Ann. tit. 10, § 1347 (1997); P.R.Laws Ann. tit. 31, § 104 (1993)] and the analogy to corporate derivative actions is strong." *Efron v. Embassy Suites (Puerto*

*Rico), Inc.*, 47 F.Supp.2d at 207–208 (citations omitted); *see* P.R.Laws Ann. tit. 10, §§ 1347, 1411–1415 (1997); P.R.Laws Ann. tit. 13, §§ 8630–8658 (1996); P.R.Laws Ann. tit. 31, § 4372 (1990). Shareholders can only bring suit as an individual if the injury is "peculiar to him alone and does not fall alike upon other shareholders." *Id.* at 208 (quoting *Roeder v. Alpha Indus., Inc.*, 814 F.2d 22, 30 (1st Cir.1987)).

*land Apartments,* 94 F.3d at 1505; *New York v. Shore Realty Corp.,* 759 F.2d 1032, 1052 (2nd Cir.1985); *United States v. Conservation Chem. Co.,* 619 F.Supp. 162, 190 (W.D.Mo.1985). Consequently, the USA's request for summary judgment (Docket No. 52) as to Avshalom Lubin's liability under CERCLA is **DENIED.**

### Facility

■ The farm or agricultural facility owned and operated by Tropical Fruit in Guayanilla, Puerto Rico where the pesticides are sprayed constitutes a "facility" under CERCLA. *See* 42 U.S.C. § 9601(9)(A) & (B);[10] *Dedham Water Co. v. Cumberland Farms Dairy, Inc.,* 889 F.2d 1146, 1151 (1st Cir.1989) (citing *United States v. Conservation Chemical Co.,* 619 F.Supp. 162, 184–85 (W.D.Mo.1985) ("facility" includes every conceivable place where hazardous substances come to be located)); *Uniroyal Chemical Co. v. Deltech Corp.,* 160 F.3d 238, 245 (5th Cir.1998) ("facility is defined in the broadest possible terms, encompassing far more than traditional waste sites.").

Defendants, reliance on CERCLA Section 103(e), 42 U.S.C. § 9603(e), as a basis for contention that Tropical Fruit farm is not a "facility" is unpersuasive. Section 103(e) provides as follows:

(e) Applicability to registered pesticide product

This section shall not apply to the application of a pesticide product registered under the Federal Insecticide, Fungicide, and Rodenticide Act [7 U.S.C.A. § 136 et seq.] or to the handling and storage of such a pesticide product by an agricultural producer.

42 U.S.C. § 9603(e). Simply, CERCLA Section 103 deals exclusively with notification requirements with respect to releases of CERCLA hazardous substances, and is irrelevant to the determination of whether the Tropical Fruit farm constitutes a "facility". The conclusion that Tropical Fruit farm constitutes a "facility" is buttressed by the caselaw finding liability for the transport, storage, spilling, and disposal of pesticides. *See e.g. Hemingway Transport, Inc.,* 993 F.2d at 920 (Drums containing "hazardous substances", solvents and pesticides, discovered at facility); *South Florida Water Management District v. Montalvo,* 84 F.3d 402 (11th Cir.1996); *Redwing Carriers, Inc. v. Saraland Apartments,* 94 F.3d 1489 (11th Cir.1996); *United States v. Hardage,* No. CIV–86–1401–P, 1989 U.S.Dist. LEXIS 17877, at *1 (W.D.Okla. Nov. 9, 1989).

### Hazardous Substance

■ Defendants concede that the "pesticides Captan 50, Diazinon 500–AG, Dithane F–45, Kocide 101, Malathion, Supracide 2E, and Tenn–Cop 5E are, or contain, hazardous substances as that term is defined by Section 101(14) of CERCLA, 42 U.S.C. § 9601(14)."[11] (Docket No. 42,

10. (9) The term "facility" means (A) any building, structure, installation, equipment, pipe or pipeline (including any pipe into a sewer or publicly owned treatment works), well, pit, pond, lagoon, impoundment, ditch, landfill, storage container, motor vehicle, rolling stock, or aircraft, or (B) any site or area where a hazardous substance has been deposited, stored, disposed of, or placed, or otherwise come to be located; but does not include any consumer product in consumer use or any vessel.
42 U.S.C. § 9601(9).

11. (14) The term "hazardous substance" means (A) any substance designated pursuant to section 1321(b)(2)(A) of Title 33, (B) any element, compound, mixture, solution, or sub-

stance designated pursuant to section 9602 of this title, (C) any hazardous waste having the characteristics identified under or listed pursuant to section 3001 of the Solid Waste Disposal Act [42 U.S.C.A. § 6921] (but not including any waste the regulation of which under the Solid Waste Disposal Act [42 U.S.C.A. § 6901 et seq.] has been suspended by Act of Congress), (D) any toxic pollutant listed under section 1317(a) of Title 33, (E) any hazardous air pollutant listed under section 112 of the Clean Air Act [42 U.S.C.A. § 7412], and (F) any imminently hazardous chemical substance or mixture with respect to which the Administrator has taken action pursuant to section 2606 of Title 15. The term does not include petroleum, including crude oil or any fraction thereof which is not other-

SOF 11); *compare* (Docket No. 1—Complaint ¶ 15), *and* (Docket No. 3—Answer ¶ 8) *with* (Docket No. 50, SOF p. 2), *and* (Docket No. 51, SOF ¶ 1); *see Dedham Water Co. v. Cumberland Farms Dairy, Inc.,* 889 F.2d at 1151 n. 6; *cf. Massachusetts v. Blackstone Valley Elec. Co.,* 67 F.3d 981 (1st Cir.1995). Furthermore, pursuant to CERCLA Section 102(a), 42 U.S.C. § 9602(a), the EPA promulgated regulations at 40 C.F.R. § 302.4 that list materials that fall under the ambit of "hazardous substances" within Section 101(14)(3) of CERCLA. *See* 40 C.F.R. § 302.4(a). Captan and Malathion are listed as hazardous substances at 40 C.F.R. § 302.4, and thus, are hazardous substances within the meaning of CERCLA Section 101(14). Additionally, Supracide-2E contains methidathion, a hazardous substance listed at 40 C.F.R. § 302.4. Of these materials, methidathion and malathion were detected in soil samples collected just outside of Tropical Fruit's farm boundaries. (Docket No. 42, Attachment 2—Exhibit 2 ¶¶ 14–15). Although the allegations are that the pesticides drifted onto adjacent properties in minute amounts, no minimum level of "hazardous substance" is required to trigger CERCLA coverage. *See A & W Smelter and Refiners, Inc. v. Clinton,* 146 F.3d 1107 (9th Cir.1998); *Reichhold Chemicals, Inc. v. Textron, Inc.,* 888 F.Supp. 1116 (N.D.Fla.1995) (CERCLA liability does not require any threshold quantity or concentration of hazardous substance.). Thus, the pesticides are "hazardous substances." *See e.g. Hemingway Transport,* 993 F.2d at 920 ("[D]rums containing various solvents and pesticides classified as "hazardous substances" under [CERCLA].").

### Actual or Threatened Release

■ A "release" is defined by CERCLA as:

> wise specifically listed or designated as a hazardous substance under subparagraphs (A) through (F) of this paragraph, and the term does not include natural gas, natural gas liq-

any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, or disposing into the environment (including the abandonment or discarding of barrels, containers, and other closed receptacles containing any hazardous substance or pollutant or contaminant), but excludes (A) any release which results in exposure to persons solely within a workplace, with respect to a claim which such persons may assert against the employer of such persons, (B) emissions from the engine exhaust of a motor vehicle, rolling stock, aircraft, vessel, or pipeline pumping station engine. (C) release of source, byproduct, or special nuclear material from a nuclear incident, as those terms are defined in the Atomic Energy Act of 1954 [42 U.S.C.A. § 2011 et seq.], if such release is subject to requirements with respect to financial protection established by the Nuclear Regulatory Commission under section 170 of such Act [42 U.S.C.A. § 2210], or, for the purposes of section 9604 of this title or any other response action, any release of source byproduct, or special nuclear material from any processing site designated under section 7912(a)(1) or 7942(a) of this title, and (D) the normal application of fertilizer.

42 U.S.C. § 9601(22). "The courts have construed CERCLA's definition of 'release' broadly." *Dedham Water Co. v. Cumberland Farms Dairy, Inc.,* 889 F.2d at 1152 (referencing *State of New York v. Shore Realty Corp.,* 759 F.2d at 1045 (2d Cir.1985) ("releases" include leaking tanks and pipelines, the continuing leaching and seepage from earlier spills, and leaking drums); *United States v. Wade,* 577 F.Supp. 1326, 1334 (E.D.Pa.1983) ("releases" include the leaching of hazardous substances into the soil)).

> uids, liquefied natural gas, or synthetic gas usable for fuel (or mixtures of natural gas and such synthetic gas).
> 42 U.S.C. § 9601(14).

In addition to hand spraying, Tropical Fruit has applied pesticides via two types of airblast sprayers—the "Smart Sprayer" and the "Tower Sprayer". Tropical Fruit applies or has applied numerous "pesticides" within the meaning of Sections 2(u) and 12 of FIFRA, see 7 U.S.C. §§ 136(u) and 136j, to its crops, including Benlate, Captan 50, Diazinon 500–AG, Dithane F–45. Kocide 101, Kocide LF, Malathion 25%, Microsperse Wettable Sulphur, Neemix, Soluble Oil Spray, Supracide 2–E, and Tenn–Cop 5E. Of these pesticides, Captan 50, Diazinon 500–AG. Dithane F–45, Kocide 101, Kocide LF, Malathion 25%, Supracide 2E, and Tenn–Cop 5E are, or contain, hazardous substances as that term is defined by Section 101(14) of CERCLA. See 42 U.S.C. § 9601(14). Allegedly, pesticide applications conducted with both the Smart Sprayer and the Tower Sprayer have resulted in numerous incidents of pesticides drifting or migrating into the community. That is, pesticide droplets, particles, and vapor have drifted or migrated onto adjacent properties. See (Docket No. 42, Attachment 2—Exhibit 2 ¶¶ 14–18). The evidence of pesticide drift or migration in this case, as detailed in the United States' motion for summary judgment, demonstrates numerous instances of movement of pesticides beyond the boundary of the Farm, which clearly falls within the scope of a "release" as defined by 42 U.S.C. § 9601(22) of CERCLA. See 42 U.S.C. § 9601(22) (". . . any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, or disposing into the environment . . ."); Dedham Water Co. v. Cumberland Farms Dairy, Inc., 889 F.2d at 1152 ("Release" is broadly construed by courts.); see also Section III.A.1. Label Requirements Regarding Prevention of Pesticide Drift, infra. Moreover, CERCLA liability also springs from the "threatened release" of a hazardous substance. See 42 U.S.C. § 9606(a); Dedham Water Co. v. Cumberland Farms Dairy, Inc., 889 F.2d at 1152.[12] Accordingly, the drift or migration of one or more of the pesticides Captan 50, Diazinon 500–AG, Dithane F–45, Kocide 101, Kocide LF, Malathion 250, Supracide 2E, and Tenn–Cop 5E beyond the boundary of the Tropical Fruit Farm constitutes a "release" or threatened release. See 42 U.S.C. §§ 9601(22) & 9606(a); Dedham Water Co. v. Cumberland Farms Dairy, Inc., 889 F.2d at 1152. The Court notes that "[t]he express language of § 9607(a)(1) imposes liability on the owner or operator of a CERCLA facility without requiring a *disposal.*" Uniroyal Chemical Co. v. Deltech Corp., 160 F.3d 238, 250 (5th Cir.1998) (emphasis added); see also United States v. Alcan Aluminum Corp., 964 F.2d 252 (3rd Cir.1992). Disposal is an element of liability only under CERCLA Sections 107(a)(2) (regarding past ownership or operation of a facility), 107(a)(3) (regarding liability in connection with arranging for disposal of hazardous substances), and 107(a)(4) (regarding—transportation of hazardous substances for disposal). See 42 U.S.C. § 9607(a)(2), (3) and (4). Accordingly, contrary to Defendants' assertion, "disposal" is not a necessary element of liability under Section 107(a)(1) of CERCLA.

### 2. Pesticide Exemption

Notwithstanding the above analysis, Tropical Fruit believes its liability under CERCLA is eviscerated by a head-on collision with CERCLA's pesticides exemption. To begin, the Court of course refers to the

12. Threatened releases have been found to include: a defendant's mere ownership of "corroding and deteriorating tanks," a defendant's "lack of expertise in handling hazardous waste," or a defendant's "failure to license the facility." Shore Realty, 759 F.2d at 1045. See also United States v. Medley, 13 Chem. Waste Lit.Rep. 143, 146 (D.S.C. Nov. 4, 1986) ("The emitting or release of volatile organics into the ambient air and the storage of hazardous substances in deteriorating or leaking drums and unlined lagoons at the Medley Farm site clearly constituted a 'release' or 'substantial threat' of release of hazardous substances into the environment."). Dedham Water Co. v. Cumberland Farms Dairy, Inc., 889 F.2d at 1152.

statutory law in question; that is Subsection 9607(i) provides:

(i) Application of a registered pesticide product

No person (including the United States or any State or Indian tribe) may recover under the authority of this section for any response costs or damages resulting from the application of a pesticide product registered under the Federal Insecticide, Fungicide, and Rodenticide Act [7 U.S.C.A. § 136 et seq.]. Nothing in this paragraph shall affect or modify in any way the obligations or liability of any person under any other provision of State or Federal law, including common law, for damages, injury, or loss resulting from a release of any hazardous substance or for removal or remedial action or the costs of removal or remedial action of such hazardous substance.

42 U.S.C. § 9607(i). There is a dearth of Court of Appeals caselaw construing the pesticide exemption. The Eleventh Circuit is the only Circuit to have touched on the exemption with its most extensive brush with the issue as follows:

"The pesticide exemption does not, standing alone, absolve the Landowners of liability under CERCLA. The contamination at the Chemairspray Site did not result from the application of pesticides to the Landowners' property. Rather, it resulted from spills while loading planes and the drainage of contaminated rinse water following spraying runs. If the Landowners were being sued for contamination of their own property caused by the application of

pesticides, then the Landowners' liability would end at § 107(i).

While this is not the case, the pesticide exemption lends credence to the view that the Sprayers have failed to state a claim of "arranged for" liability against the Landowners. The Landowners contracted with the Sprayers "to apply and/or distribute" pesticides. Again, the only reasonable assumption based on the allegations of the Sprayers' complaint is the Landowners contracted to have pesticides applied to their property—not spilled on the Chemairspray Site. Given § 107(i) insulates the Landowners from liability for any contamination resulting from the application of pesticides to their property, it would be inconsistent to read § 107(a)(3) as imposing liability based on the Landowners having contracted to have pesticides applied to their property."

*South Fla. Water Management Dist. v. Montalvo*, 84 F.3d 402, 409 n. 11 (11th Cir.1996); *see also Redwing Carriers, Inc. v. Saraland Apartments*, 94 F.3d 1489, 1511 n. 31 (11th Cir.1996) (Affirmed Section 9607(i) exempted defendant from liability for proper application of FIFRA registered pesticides.). Thus, the Court turns to our fellow District Courts' opinions for persuasive guidance.

Of the District Court opinions surveyed,[13] one of the first and most extensive examination of the pesticide exemption is discussed in *United States v. Hardage*, No. CIV-86-1401-P, 1989 U.S.Dist. LEXIS 17877, at *1 (W.D.Okla. Nov. 9, 1989),

**13.** The Court identified the following relevant opinions: *United States v. Hardage*, No. CIV-86-1401-P, 1989 U.S.Dist. LEXIS 17877, at *1 (W.D.Okla. Nov. 9, 1989); *Artesian Water Co. v. Government of New Castle County*, 605 F.Supp. 1348 (D.Del.1985); *South Fla. Water Management Dist. v. Montalvo*, No. 88-8038-CIV-DAVIS, 1988 WL 242688, at *1 (S.D.Fla. Nov.8, 1988); *Prudential Ins. Co. v. United States Gypsum*, 711 F.Supp. 1244 (D.N.J. 1989); *United States v. Morrison-Quirk Grain Corp.*, No. CV88-L-720, 1990 WL 482139, at *1 (D.Neb. May 4, 1990); *Jordan v. Southern*

*Wood Piedmont Co.*, 805 F.Supp. 1575 (S.D.Ga.1992); *Beers v. Williams Pipe Line Co.*, No. 93-C-2189-EEO, 1994 WL 477187, at *1 (D.Kan. Aug. 24, 1994); *Redwing Carriers, Inc. v. Saraland Apartments, Ltd.*, 875 F.Supp. 1545 (S.D.Ala.1995); *New York v. Almy Bros., Inc.*, 971 F.Supp. 69 (N.D.N.Y. 1997); *United States v. Iron Mountain Mines, Inc.*, 987 F.Supp. 1244 (E.D.Cal.1997); *State v. Almy Bros., Inc.*, No. 90-CV-818, 1998 WL 438523, at *1 (N.D.N.Y.1998); *Cameron v. Navarre Farmers Union Coop. Ass'n*, 76 F.Supp.2d 1178 (D.Kan.1999).

which is repeated here for ease of the reader:

Stock Yards argues that this statutory exclusion extends to the disposal of used pesticides, since the disposal "results from" the application of toxaphene by Stock Yards. Stock Yards then urges other language within CERCLA, that is the "generator" definition contained in 42 U.S.C. § 9607(a)(3) concerning liability of persons who "arranged for disposal", and the definition of "release" contained in 42 U.S.C. § 9601(22) which excludes "the normal application of a fertilizer", shows Congress intended to exclude liability under CERCLA for releases "resulting from" the application of a pesticide. Stock Yards then asserts that disposal of pesticide wastes, after the use of a pesticide, is such a release. Stock Yards' brief at 7–9.

The United States responds that the pesticide exclusion in Section 107(i) provides a very limited exception to CERCLA liability. The United States urges that the language of Section 107(i), when read in the entire context of CERCLA, can in no way be interpreted to prohibit the United States from recovering response costs resulting from the disposal of registered pesticides. The United States argues that Stock Yards' "reading" of Section 107(i) is clearly inconsistent with the plain meaning of the Section and its applicable legislative history. United States' response brief at 2–4.

Words of a statute are to be interpreted as ordinarily defined and within the meanings commonly attributed to them. *Glover Constr. Co. v. Andrus,* 591 F.2d 554, 561 (10th Cir.1979), *aff'd,* 446 U.S. 608, 100 S.Ct. 1905, 64 L.Ed.2d 548 (1980). "It is to be presumed that 'the legislative purpose is expressed by the ordinary meaning of the words used.'" *Barnes v. Cohen,* 749 F.2d 1009, 1013 (3rd Cir.1984) (citing *Richards v. United States,* 369 U.S. 1, 9, 82 S.Ct. 585, 7 L.Ed.2d 492 (1962)), *cert. denied,* 471 U.S. 1061, 105 S.Ct. 2126, 85 L.Ed.2d 490 (1985). And, where the terms of the statute are unambiguous, judicial inquiry is complete except in rare and unusual circumstances. *Rubin v. United States,* 449 U.S. 424, 431, 101 S.Ct. 698, 66 L.Ed.2d 633 (1981). Finally, courts do not construe statutory phrases in isolation, but read statutes as a whole. *United States v. Morton,* 467 U.S. 822, 828, 104 S.Ct. 2769, 81 L.Ed.2d 680 (1984).

In applying these statutory construction standards, the Court first examined the dictionary definitions of the words involved. "Application" is defined as: "the act of applying," and "the act of putting to a special use or purpose." Websters II, New Riverside University Dictionary 118 (1984). "Disposal" is defined as "an act of throwing out or away." Id. at 388. The United States argues the "application" language of Section 107(i) is clear and unambiguous. The Court agrees.

After examining the clear meaning of the words used by Congress in the pesticide exclusion, the Court then looked to the CERCLA statute as a whole. *United States v. Morton,* 467 U.S. at 828, 104 S.Ct. 2769. Section 107 of CERCLA, of which the Section 107(i) exclusion is a subpart, establishes liability for: "(3) any person who by contract, agreement or otherwise arranged for disposal. . . ." The fact that the general liability standard for disposal was omitted from the narrow exemption of Section 107(i) by the selection of the word "application" was not an oversight. The word "application" was not defined in CERCLA. However, when Congress adopted the FIFRA registered pesticide application exclusion in Section 107(i), Congress is presumed to have been aware of regulations implementing FIFRA which defined "application of a pesticide" as follows:

> The term "application of a pesticide" means the placement for effect of a pesticide at or on the site where the pest control or other response is desired.

40 C.F.R. § 162.3(j).

Reading the statute as a whole, together with the appropriate regulations, shows

clearly what the Congress intended. Congress intended that no person be permitted to recover response costs or damages attributable to the actual use of a registered pesticide at its place of use.

While the Court finds the clear language of the statute displays Congress' intention, examination of the legislative history further strengthens the Court's interpretation. The final version of CERCLA's pesticide application exclusion evolved from an early Senate bill—S.1480. Senate bill 1480, as originally reported, included three separate exclusions relating to fertilizer and pesticides, all of which were designed to exclude from liability releases due to the normal "field" application of fertilizer or pesticides. See remarks of Senator Cannon, 126 Cong.Reg. 30984 (Nov. 24, 1980). When read together, these sections make clear that the exclusion was designed to protect farmers from liability for releases attributable to application of pesticides at their place of use. Section 2(b)(16) of Senate bill 1480 excluded "the normal field application of fertilizer," from the definition of "release", while Section 4(k) exempted from liability "removal costs or damages resulting from the field application of a pesticide product...."

The Committee Report on Senate bill 1480 issued on July 11, 1980 by the Senate Committee on Environment and Public Works discussed why Congress wanted to limit the exclusion under Section 4(k) [the pesticide application exclusion] to field application only, and not to disposal:

> In the course of its deliberations on the bill, the Committee reviewed a substantial body of evidence indicating that injuries to humans and damages to natural resources and food from pesticide releases are widespread. In some cases, these injuries and damages can be traced to spillage, leakage, or improper disposal of pesticides, their residue, and wastes.[6]

The exclusion covers only liability for "field application" of a pesticide. This is intended to mean the use of a pesticide in accordance with its purpose....

> ... The prohibition on use of the fund is a narrow one, covering only those releases which are "field applications" in accordance with the purposes of the product. Claimants who are injured by spilling, dumping, disposal, or leaking of pesticides, whether intentional or accidental, would have recourse to the Fund and section 4 liability provisions under this provision. (Emphasis added).

Report No. 96–848, Environmental Emergency Response Act, Report of the Committee on Environment and Public Works at 45, U.S. Senate (July 11, 1980).

6. Footnotes omitted.

Congress' intent to have a narrow exemption from liability limited solely to applications to place of use is further reinforced by other legislative history. An example is that the American Farm Bureau opposed Senate bill 1480 because it felt the exemption was too narrow since it did not apply to transport or storage of pesticides. 126 Conf.Rec. S.26058 (Sept. 18, 1980). In considering a similar bill in September, 1980, the House discussion indicated the pesticide exclusion was designed to apply to "farmers who apply chemicals on their own property." See remarks of Rep. Breaux, 126 Conf.Rec. 26334 (Sept. 19, 1980). While the pesticide exemption in Senate bill 1480 was later changed on the floor of the Senate to remove the word "field", statements made at the time show "these changes in no way ... alter the original intent of these exclusions reflected in the legislative history accompanying S.1480 as originally reported." See remarks of Senator Cannon, 126 Cong.Rec. S.15006 (Nov. 24, 1980).

The Stock Yards has provided the Court with no further authority or legislative history which would convince the Court, as Judge West found, that Congress intended no distinction between "application" and "disposal" of a pesticide product registered

under FIFRA. Accordingly, the Stock Yards' motion for summary judgment should be DENIED as Section 107(i) pesticide application exclusion provides no protection for liability because of disposal.

*United States v. Hardage*, No. CIV–86–1401–P, 1989 U.S.Dist. LEXIS 17877, at *7–15.

▮ The Court is convinced that the pesticide exemption of CERCLA is a narrow exemption, *See Jordan v. Southern Wood Piedmont Co.*, 805 F.Supp. at 1582. The contours of the pesticide exemption have been honed as to not cover pesticide disposal, storage, spills, transport. *See South Fla. Water Management Dist. v. Montalvo*, 84 F.3d at 409 n. 11 (Exemption inapplicable to "spills while loading planes and the drainage of contaminated rinse water following spraying runs."); *Cameron v. Navarre Farmers Union Coop. Ass'n*, 76 F.Supp.2d at 1182 (Not everything done with a pesticide is an "application", and CERCLA retains liability for a "release" of a pesticide.); *State v. Almy Bros., Inc.*, No. 90–CV–818, 1998 WL 438523, at *5 (CERCLA exempts "application" but, retains liability for "spilled or released pesticides on the site."); *Redwing Carriers, Inc. v. Saraland Apartments, Ltd.*, 875 F.Supp. at 1565 ("Application" is exempt, but CERCLA "retains liability for a 'release' of such pesticide.") (quoting *In re Sundance Corp.*, 149 B.R. 641, 663 (Bankr.E.D.Wash.1993)); *United States v. Morrison–Quirk Grain Corp.*, No. CV88–L–720, 1990 WL 482139, at *5 (Pesticide's "release" due to explosion cannot be considered an "application".); *United States v. Hardage*, No. CIV–86–1401–P, 1989 U.S.Dist. LEXIS 17877, at *14 (Pesticide exemption under CERCLA applies to "field application" and not to "disposal", transport or storage.); *see also South Fla. Water Management Dist. v. Montalvo*, No. 88–8038–CIV–DAVIS, 1988 WL 242688, at *1 (Spill and pesticides wastewater not covered by "Farmer's Exemption."). More importantly for this case, not every

"application" is exempted for CERCLA liability.

"As the party seeking to take advantage of the statutory exemption provided by 42 U.S.C. § 9607(i), [Tropical Fruit] bears the burden of proof." *Cameron v. Navarre Farmers Union Coop. Ass'n*, 76 F.Supp.2d at 1182 (citing *United States v. Morrison–Quirk Grain Corp.*, No. CV88–L–720, 1990 WL 482139, at *2). Although CERCLA does not define "application", the Court recalls from that the FIFRA regulations define "application of a pesticide" as the "placement for effect of a pesticide at or on the site where the pest control or other response is desired." 40 C.F.R. 162.3(j); *see United States v. Hardage*, No. CIV–86–1401–P, 1989 U.S.Dist. LEXIS 17877, at *11. "Thus, [Tropical Fruit] must show that the [pesticides] it used [were] registered under FIFRA and that it applied it in the customary manner." *Cameron v. Navarre Farmers Union Coop. Ass'n*, 76 F.Supp.2d at 1182; *see Jordan v. Southern Wood Piedmont Co.*, 805 F.Supp. at 1581; *United States v. Hardage*, No. CIV–86–1401–P, 1989 U.S.Dist. LEXIS 17877, at *14. However, the Court has already found in Section III.A.1. infra, that Tropical Fruit applied the pesticides in a manner which allowed for drift in contravention of FIFRA labeling requirements. Because the Court has held that the pesticides, from the evidence on the summary judgment record, were improperly applied by Tropical Fruit, those incidents are not afforded protection by the pesticides exemption under § 9607(i). *See id.* (Defendant's liability depends "upon whether a proper 'application' occurred, ..."); *see also Redwing Carriers, Inc. v. Saraland Apartments*, 94 F.3d at 1511; *United States v. Hardage*, No. CIV–86–1401–P, 1989 U.S.Dist. LEXIS 17877, at *13.

Tropical Fruit has not proffered any authority that convinces that Court that a misapplication of pesticides which causes contamination on adjacent properties is afforded shelter under the pesticides exemp-

tion. Practically the Court's holding makes sense with purpose of CERCLA to deter hazardous waste proliferation. The drift of pesticides can readily be analogized to an industrial polluter that allows hazardous substances to infiltrate neighbors properties. Accordingly, the USA's motion for summary judgment is **GRANTED** and Tropical Fruit, with the exception of Avshalom Lubin, is consequently held liable under CERCLA,

## IV. CONCLUSION

Accordingly, pursuant to Section 16(c) of FIFRA, 7 U.S.C. § 136n, Defendants, Tropical Fruit, S.E., and its general partners, Cesar Otero Acevedo, and Pedro Toledo Gonzalez, are subject to an injunction requiring them to:

1. Cease and desist from allowing pesticides to drift onto adjacent properties;

2. Cease and desist from using pesticides on unauthorized target crops in violation of the pesticide labels, including using Dithane F–45 on mangoes, and cease and desist from using pesticides at times prohibited by the label, including using Supracide 2–E at times other than the period from the postharvest of mangoes until the bloom stage of mangoes;

3. Provide post pesticide safety information in an area where workers or pesticides handlers can readily see and read the information, provide a decontamination area for washing off pesticides, and require and ensure pesticide handlers pesticide handlers, including persons who mix pesticides, wear personal protective equipment ("PPE") as required by the labels for the pesticides; and

4. Properly dispose of all pesticide containers according to label requirements.

Further, Defendants, Tropical Fruit, S.E., and its general partners, Cesar Otero Acevedo, and Pedro Toledo Gonzalez, are held liable for violations of CERCLA.

WHEREFORE, the Court **GRANTS IN PART** the United States' motion for summary judgment (Docket No. 42) in accordance with this Opinion and Order against Defendants, Tropical Fruit, S.E., and its general partners, Cesar Otero Acevedo, and Pedro Toledo Gonzalez The remainder of the motion is **DENIED**. Defendants' cross motion for partial summary judgment under CERCLA (Docket No. 48) is **DENIED**.

IT IS SO ORDERED.

## APPENDIX

### *EXHIBIT A: USA'S STATEMENT OF UNCONTESTED FACTS*

1. Tropical Fruit S.P. is a partnership organized under the laws of the Commonwealth of Puerto Rico. (*See* Testimony of Pedro Toledo, Hearing on Order to Show Cause of November 19, 1997, Transcript p. 194 ("Hearing Transcript") (attached hereto as attachment 1); Interim Order on Consent of March 26, 1997 at 1 ("IOC") (attached hereto as attachment 2); Deposition of Avshalom Lubin and Pedro Toledo of March 29, 1996 at 14–16 ("Lubin/Toledo Dep.") (attached hereto as attachment 3); Complaint ¶ 4 and Answer ¶ 3 (attached hereto as attachment 39)). .

2. Tropical Fruit, S.P. owns and operates a farm at Road No. 335, KM 7.2, Rural Zone Boca, Guayanilla, Puerto Rico. (*See* Testimony of Pedro Toledo, Hearing Transcript at 194 (attachment 1); Lubin/Toledo Dep. at 18 (attachment 3); Complaint ¶ 4 and Answer ¶ 3 (attachment 39)).

3. Tropical Fruit grows mangoes, bananas, and plantains at the farm. (*See* Testimony of Pedro Toledo, Hearing Transcript at 195 (attachment 1); Lubin/Toledo Dep. at 19 (attachment 3); Complaint ¶ 4 and Answer ¶ 3 (attachment 39)).

4. Defendants Avshalom Lubin, Pedro Toledo Gonzalez, and Cesar Otero Acevedo are general partners in Tropical Fruit. (*See* Lubin/Toledo Dep. at 15–16 (attachment 3); IOC at 18 (attachment 2); Complaint ¶ 5 and Answer ¶ 4 (attachment 39)).

5. Avshalom Lubin is the managing partner of Tropical Fruit. (*See* Lubin/Toledo Dep. at 16 (attachment 3); Complaint ¶ 5 and Answer ¶ 4 (attachment 39)).

6. Pedro Toledo Gonzalez is the president of Tropical Fruit. (*See* Testimony of Pedro Toledo, Hearing Transcript at 194 (attachment 1); Complaint ¶ 5 and Answer ¶ 4 (attachment 39)).

7. Tropical Fruit, S.P., is a "person" within the meaning of Sections 2(s) and 12 of FIFRA, 7 U.S.C. §§ 136(s) and 136j, and Section 101(21) of CERCLA, 42 U.S.C. § 9601(21). (*See* Complaint ¶ 15 and Answer ¶ 8 (attachment 39)).

8. Avshalom Lubin, Pedro Toledo Gonzalez, and Cesar Otero Acevedo are "persons" within the meaning of Sections 2(s) and 12 of FIFRA, 7 U.S.C. §§ 136(s) and 136j, and Section 101(21) of CERCLA, 42 U.S.C. § 9601(21). (*See* Complaint ¶ 15 and Answer ¶ 8 (attachment 39)).

9. The Tropical Fruit Farm is a "facility" within the meaning of Section 101(9) of CERCLA, 42 U.S.C. § 9601(9).

10. Benlate, Captan 50, Diazinon 500–AG, Dithane F–45, Kocide 101, Malathion, Microsperse Wettable Sulphur, Neemix, Soluble Oil Spray, Supracide 2–E, Tenn–Cop 5E are "pesticides" within the meaning of Sections 2(u) and 12 of FIFRA, 7 U.S.C. §§ 136(u) and 136j. (*See* Complaint ¶ 16 and Answer ¶ 9 (attachment 39)).

11. The pesticides Captan 50, Diazinon 500–AG, Dithane F–45, Kocide 101, Malathion, Supracide 2E, and Tenn–Cop 5E are, or contain, hazardous substances as that term is defined by Section 101(14) of CERCLA, 42 U.S.C. § 9601(14). (*See* Complaint ¶ 15 and Answer ¶ 8 (attachment 39)).

12. The movement of one or more of the pesticides Captan 50, Diazinon 500–AG, Dithane F–45. Kocide 101, Kocide LF, Malathion 25%, Supracide 2E, and Tenn–Cop 5E beyond the boundary of the Tropical Fruit Farm constitutes a "release" or threatened release, within the meaning of Section 101(22) of CERCLA, 42 U.S.C. § 9601(22).

13. Section 12(a)(2)(G) of FIFRA, 7 U.S.C. § 136j(a)(2)(G), prohibits using "any registered pesticide in a manner inconsistent with its labeling. . . ." (*See* Complaint ¶ 7 and Answer ¶ 5 (attachment 39)).

14. The labels for the pesticides Benlate, Diazinon 500–AG, Dithane F–45, Kocide 101, Soluble Oil Spray, Supracide–2E, Tenn–Cop 5E, Microsperse Wettable Sulphur, and Neemix, contain specific use restrictions regarding application methods, application rates, and target crops. (*See* labels attached hereto as attachment 4; Complaint ¶ 8 and Answer ¶ 5 (attachment 39)).

15. Application of the pesticides Benlate, Diazinon 500–AG, Dithane F–45, Kocide 101, Soluble Oil Spray, Supracide–2E, Tenn–Cop 5E, Microsperse Wettable Sulphur, and Neemix to crops not listed on the labels for each such pesticide is prohibited. (*See* Complaint ¶ 8 and Answer ¶ 5 (attachment 39)).

16. The labels for the pesticides Benlate, Diazinon 500–AG, Dithane F–45, Kocide 101, Soluble Oil Spray, Supracide–2E, Tenn–Cop 5E, Microsperse Wettable Sulphur, and Neemix state in part:

"[d]o not apply this product in a way that will contact workers or other persons either directly or through drift." (*See* Pesticide Labels (attachment 4); Complaint ¶ 18 and Answer ¶ 11 (attachment 39)).

17. "Drift" is the movement off site of droplets, particles, and vapor. (*See* Testimony of William Hunt, Hearing Transcript p. 46 (attached hereto as attachment 5); Testimony of Jeffrey Jenkins, Hearing Transcript p. 85 (attached hereto as attachment 6)).

18. There is always off-site drift of some amount of pesticides when pesticides are applied with an air blast sprayer at the Tropical Fruit Farm. (*See* Testimony of Robert Krieger, Hearing Transcript pp.

67, 72, 77 and p. 80 (attached hereto as attachment 7)).

19. On June 25, 1996, Defendants applied Kocide 101 and Supracide 2E in Farm sectors 2–4–6 between approximately 5:00 p.m. and 1:00 a.m. (*See* Tropical Fruit Spray Records for June 25, 1996 (attached hereto as attachment 8)).

20. As a result of Defendants' June 25, 1996 application of pesticides, pesticides migrated beyond the boundary of the Tropical Fruit Farm. (*See* Declaration of Palmira Rodríguez, March 13, 1997 at ¶¶ 7–8 (attached hereto as attachment 9)).

21. On July 1, 1996, Defendants applied Kocide 101 and Supracide 2E in Farm sectors 2–4–6 between approximately 5:00 p.m. and 7:30 p.m. (*See* Tropical Fruit Spray Records for July 1, 1996 (attachment 8); Declaration of Jorge Maldonado (Puerto Rico Department of Agriculture Inspector), March 18, 1997 at ¶ 9 ("Maldonado Dec.") (attached hereto as attachment 10)).

22. As a result of Defendants' July 1, 1996 application of pesticides, pesticides migrated beyond the boundary of the Tropical Fruit Farm. (*See* Inspection Report of Jorge Maldonado, July 5, 1996 at 1 and Certificates of Analysis—Pesticides Samples Nos. 07–02–96–3061–02–02PR and 07–02–96–3061–02–01PR (attached hereto as attachment 11)).

23. On July 2, 1996, Defendants applied Kocide 101 and Supracide 2E in Farm sectors 9–10 between approximately 7:00 p.m. and 9:45 p.m. (*See* Tropical Fruit Spray Records for July 2, 1996 (attachment 8); Maldonado Dec. at ¶ 12 (attachment 10); Affidavit of Edilberto Gonzalez (Tropical Fruit Farm Manager), July 2, 1996 at 1 and 2 (attached hereto as attachment 12)).

24. On July 2, 1996, Defendants applied Kocide 101 and Supracide 2E in Farm sectors 7–8 between approximately 9:45 p.m. and 11:00 p.m. (*See* Tropical Fruit Spray Records for July 2, 1996 (attach-ment 8); Maldonado Dec. at ¶ 12 (attachment 10); Affidavit of Edilberto Gonzalez July 2, 1996 at 1 and 2 (attachment 12)).

25. As a result of Defendants' July 2, 1996 application of pesticides, pesticides migrated beyond the boundary of the Tropical Fruit Farm. (*See* Maldonado Dec. at ¶ 17 (attachment 10)).

26. On July 16, 1996, Defendants applied Benlate and Kocide 101 in Farm sectors 2–4–6 between approximately 6:00 p.m. and 11:00 p.m. (*See* Tropical Fruit Spray Records for July 16, 1996 (attachment 8); Maldonado Dec. at ¶¶ 15–16 (attachment 10)).

27. As a result of Defendants' July 16, 1996 application of pesticides, pesticides migrated beyond the boundary of the Tropical Fruit Farm. (*See* Maldonado Dec. at ¶¶ 15–16 (attachment 10)).

28. On February 4, 1997, Defendants applied Benlate and Tenn–Cop 5E in Farm sectors 1–3–5 between approximately 5:00 p.m. and 11:00 p.m. (*See* Statement of Luis Santos (EPA Inspector) February 7, 1997 (attached hereto as attachment 13); Declaration of Ramon Bastel (Community Resident), March 13, 1997 ("Bastel Dec. March 13, 1997") at ¶¶ 3, 5, and 7 (attached hereto as attachment 14); Declaration of Dalila Bonilla (Community Resident), March 13, 1997 ("Bonilla Dec. March 13, 1997") at ¶ 5 (attached hereto as attachment 15); Declaration of Francys Cueto (Community Resident), March 13, 1997 ("Cueto Dec.") at ¶ 4 (attached hereto as attachment 16); Declaration of Austre Falche (Community Resident), March 13, 1997 ("Falche Dec. March 13, 1997") at ¶¶ 2, 3 and 4 (attached hereto as attachment 17); Declaration of Maria Figueroa (Community Resident), March 13, 1997 ("Figueroa Dec. March 13, 1997") at ¶¶ 13–17 (attached hereto as attachment 18); Declaration of Daniel Gonzalez, Jr. (Community Resident), March 13, 1997 ("Gonzalez, Jr. Dec.") at ¶ 5 (attached hereto as attachment 19); Declaration of Francisca Irizarry (Community Resident), March 13, 1997 ("F. Irizarry Dec.") at ¶ 4 (attached hereto as attachment 20); Declaration of Joaquina Mari (Community Resi-

dent), March 13, 1997 ("Mari Dec.") at ¶ 4 (attached hereto as attachment 21); Declaration of Noel Munoz (Community Resident), March 13, 1997 ("Munoz Dec.") at ¶ 3 (attached hereto as attachment 22)).

29. As a result of Defendants' February 4, 1997 application of pesticides, pesticides migrated beyond the boundary of the Tropical Fruit Farm. *(See* Bastel Dec. March 13, 1997 at ¶¶ 5 and 7 (attachment 14); Bonilla Dec. March 13, 1997 at ¶ 5 (attachment 15); Cueto Dec. at ¶ 4 (attachment 16); Falche Dec. March 13, 1997 at ¶¶ 2, 3 and 4 (attachment 17); Figueroa Dec. March 13, 1997 at ¶¶ 13–17 (attachment 18); Gonzalez, Jr. Dec. at ¶ 5 (attachment 19); F. Irizarry Dec. at ¶ 4 (attachment 20) Munoz Dec. at ¶ 3 (attachment 22)).

30. On March 3, 1997, Defendants applied Benlate and Tenn–Cop 5E in Farm sectors 1–3–5 between approximately 5:00 p.m. and 11:30 p.m. (*See* Tropical Fruit Spray Records for March 3, 1996 (attachment 8)).

31. As a result of Defendants' March 3, 1997 application of pesticides, pesticides migrated beyond the boundary of the Tropical Fruit Farm. (*See* Bastel Dec. March 13, 1997 at ¶¶ 9 and 10 (attachment 14); Bonilla Dec. March 13, 1997 at ¶ 3 (attachment 15); Figueroa Dec. March 13, 1997 at ¶¶ 13–17 (attachment 18); Gonzalez, Jr. Dec. at ¶ 3 (attachment 19); Declaration of Daniel Gonzalez, Sr. (Community Resident), March 13, 1997 ("Gonzalez, Sr. Dec.") at ¶ 3 (attached hereto as attachment 23)).

32. On March 4, 1997, Defendants applied Tenn–Cop 5E in Farm sectors 2–4–6 between approximately 7:00 a.m. and 2:00 p.m. (*See* Tropical Fruit Spray Records for March 4, 1996 (attachment 8)).

33. As a result of Defendants' March 4, 1997 application of pesticides, pesticides migrated beyond the boundary of the Tropical Fruit Farm. (*See* Bastel Dec. March 13, 1997 at ¶¶ 9 and 10 (attachment 14); Bonilla Dec. March 13, 1997 at ¶ 3

(attachment 15); Gonzalez, Jr. Dec. at ¶ 3 (attachment 19); Gonzalez, Sr. Dec. at ¶ 3 (attachment 23)).

34. On March 5, 1997, Defendants applied Tenn–Cop 5E in Farm sectors 2–4–6 between approximately 7:00 a.m. and 12:00 p.m. (*See* Tropical Fruit Spray Records for March 5, 1996 (attachment 8)).

35. As a result of Defendants' March 5, 1997 application of pesticides, pesticides migrated beyond the boundary of the Tropical Fruit Farm. (*See* Bastel Dec. March 13, 1997 at ¶¶ 9 and 10 (attachment 14); Bonilla Dec. March 13, 1997 at ¶ 3 (attachment 15); Gonzalez, Jr. Dec. at ¶ 3 (attachment 19); Gonzalez, Sr. Dec. at ¶ 3 (attachment 23); Mari Dec. at ¶ 3 (attachment 21)).

36. On March 6, 1997, Defendants applied Tenn–Cop 5E in Farm sectors 2–4–6 between approximately 7:00 a.m. and 9:00 a.m. (*See* Tropical Fruit Spray Records for March 6, 1996 (attachment 8)).

37. As a result of Defendants' March 6, 1997 application of pesticides, pesticides migrated beyond the boundary of the Tropical Fruit Farm. (*See* Bastel Dec. March 13, 1997 at ¶¶ 9 and 10 (attachment 14); Bonilla Dec. March 13, 1997 at ¶ 3 (attachment 15); Gonzalez, Jr. Dec. at ¶ 3 (attachment 19); Gonzalez, Sr. Dec. at ¶ 3 (attachment 23); Mari Dec. at ¶ 3 (attachment 21); Declaration of Shiriataim Irizarry (Community Resident), March 13, 1997 at ¶ 2 (attached hereto as attachment 24)).

38. On March 20, 1997, Defendants applied Tenn–Cop 5E and Neemix in Farm sectors 1–3–5 between approximately 5:00 p.m. and 10:30 P.M. (*See* Tropical Fruit Spray Records for March 6, 1996 (attachment 8)).

39. As a result of Defendants' March 20, 1997 application of pesticides, pesticides migrated beyond the boundary of the Tropical Fruit Farm. (*See* Declaration of Maria Figueroa, March 24, 1997 at ¶¶ 1–3, 8 and 9 (attached hereto as attachment 25); Declaration of Joaquina Mari, March

24, 1997 at ¶¶ 3 and 4 (attached hereto as attachment 26)).

40. On May 21, 1997, Defendants applied Kocide 101 in Farm sectors 1–3–5 between approximately 5:00 p.m. and 11:00 p.m. (*See* Tropical Fruit Spray Records for May 21, 1996 (attachment 8); Declaration of Lizette Lugo (EPA Inspector), November 3, 1997 ("Lugo Dec.") at ¶ 13 and attachment 1 (Police Commissioner Rodriquez Statement) (attachment 27)).

41. As a result of Defendants' May 21, 1997 application of pesticides, pesticides migrated beyond the boundary of the Tropical Fruit Farm. (*See* Lugo Dec. at ¶ 13 and attachment 1 thereto (attachment 27)).

42. On October 21, 1997, Defendants applied Supracide in Farm sectors 1–3–5 between approximately 4:30 p.m. and 10:15 p.m. (*See* Testimony of Edilberto Gonzalez, Hearing Transcript pp. 172, 234, 238 and 240; Tropical Fruit Spray Records for October 21, 1996 (attachment 28)).

43. As a result of Defendants' October 21, 1997 application of pesticides, pesticides migrated beyond the boundary of the Tropical Fruit Farm. (*See* Declaration of Jose Rodriquez (Commissioner of Guayanilla Municipal Police), October 23, 1997, at ¶¶ 2, 4, 5, and 9 (attached hereto as attachment 29) and Hearing Transcript p. 242 (attached hereto as attachment 30); Testimony of Dalilla Bonilla, Hearing Transcript p. 208 (attached hereto as attachment 31); Testimony of Austre Falche, Hearing Transcript pp. 224 and 232 (attached hereto as attachment 32); Declaration of Ramon Bastel, October 23, 1997 at ¶¶ 2–6 (attached hereto as attachment 33) and Hearing Transcript p. 241 Plaintiff's Exhibit 17 (attached hereto as attachment 34); Declaration of Maria Figueroa, October 23, 1997 at ¶¶ 2–6 (attached hereto as attachment 35)).

44. The label for the pesticide Dithane F–45 does not authorize its use on man-goes. (*See* Dithane F–45 Pesticide Label (attachment 4)).

45. On or about March 5, 1996, Defendants applied Dithane F–45 to mango trees. (*See* Maldonado Dec. at ¶ 3 (attachment 10); Affidavit of Edilberto Gonzalez, March, 5 1996 at 1 and 2 (attached hereto as attachment 36); Tropical Fruit Spray Records for March, 1996 (attachment 8)).

46. With respect to mango trees, the label for the pesticide Supracide 2–E does not authorize application while mangoes are present on mango trees, stating in part: "[a]pply during the postharvest to bloom stage . . . ." (*See* Supracide 2–E Pesticide Label (attachment 4)).

47. On July 2, 1996, Defendants applied Supracide 2–E to mango trees while mangoes were present on the trees. (*See* Maldonado Dec. at ¶ 12 (attachment 10); Affidavit of Edilberto Gonzalez, July, 2 1996 at 2 (attachment 12); Tropical Fruit Spray Records for July 2, 1996 (attachment 8)).

48. The labels for the pesticides Benlate, Dithane F–45, Kocide 101, Soluble Oil Spray, and Supracide 2–E require that they be used only in accordance with the worker protection standards appearing in 40 C.F.R. Part 170. (*See* Pesticide Labels (attachment 4); Complaint ¶¶ 29–32 and Answer ¶ 20 (attachment 39)).

49. The labels for the pesticides Benlate, Dithane F–45, and Kocide 101 require that pesticide handlers, including persons who mix pesticides, wear personal protective equipment. (*See* Pesticide Labels (attachment 4); Complaint ¶ 33 and Answer ¶ 20 (attachment 39)).

50. On or about March 5, 1996, Defendants applied the pesticides Dithane F–45 and Kocide 101 without: posting warning signs; posting pesticide safety information; or providing a decontamination area. (*See* Maldonado Dec. at ¶ 4 (attachment 10); Affidavit of Edilberto Gonzalez, March, 5 1996 at 2 (attachment 36); Tropical Fruit Spray Records for March, 1996 (attachment 8)).

51. On March 5, 1996, Defendants' pesticides handlers did not wear all personal protective equipment required by the labels of Dithane F–45 and Kocide 101 while engaged in mixing or application activities for one or more of these pesticides. (*See* Maldonado Dec. at ¶ 4 (attachment 10); Affidavit of Edilberto Gonzalez, March, 5 1996 at 2 (attachment 36)).

52. On March 25, 1996, Defendants applied the pesticides Kocide 101 and Supracide 2–E, without: posting warning signs; posting pesticide safety information; or providing a decontamination area. (*See* Maldonado Dec. at ¶¶ 6 and 7 (attachment 10); Affidavit of Edilberto Gonzalez, March, 25 1996 1 and 2 (attached hereto as attachment 37); Tropical Fruit Spray Records for March, 1996 (attachment 8)).

53. On May 13, 1996, Defendants applied the pesticides Benlate and Kocide 101 without: posting warning signs; posting pesticide safety information; or providing a decontamination area. (*See* Maldonado Dec. at ¶ 8 (attachment 10); Affidavit of Edilberto Gonzalez, May 13, 1996 1 and 2 (attached hereto as attachment 38); Tropical Fruit Spray Records for May, 1996 (attachment 8)).

54. On May 13, 1996, Defendants' pesticides handlers did not wear all personal protective equipment required by the labels of the pesticides Benlate and Kocide 101 while engaged in mixing or application activities for one or more of these pesticides (*See* Maldonado Dec. at ¶ 8 (attachment 10); Affidavit of Edilberto Gonzalez, May 13, 1996 1 and 2 (attached hereto as attachment 38)).

55. On July 2, 1996, Defendants applied the pesticides Kocide 101 and Supracide 2–E without: posting warning signs; posting pesticide safety information; or providing a decontamination area. (*See* Maldonado Dec. at ¶ 13 (attachment 10); Affidavit of Edilberto Gonzalez, July 2 at 1 and 2 (attachment 12); Tropical Fruit Spray Records for July 2, 1996 (attachment 8)).

56. The label for the pesticide Diazinon 500–AG contains instructions for plastic container disposal, which states in part; "[t]riple rinse (or equivalent). Then puncture and dispose of in a sanitary landfill, or incinerator, or burn." (*See* Diazinon Pesticide Label (attachment 4); Complaint ¶ 38 and Answer ¶ 25 (attachment 39)).

57. On at least March 5, 1996, Defendants failed to triple rinse, puncture and dispose of or burn, empty container(s) of Diazinon 500–AG. (*See* Maldonado Dec. at ¶ 5 (attachment 10); Affidavit of Edilberto Gonzalez, March, 5 1996 at 1 and 2 (attachment 36)).

58. The IOC of March 27, 1997, orders the Defendants to "not spray any pesticides and hazardous substances at the Farm in such a manner that the pesticides or hazardous substances may drift or otherwise migrate beyond the boundaries of the Farm" and the EPA's Administrative Order of December 20, 1996, incorporated into the IOC, orders the Defendants to "immediately cease and desist from spraying Malathion, Supracide–2E, Captan 50, Dithane F–45, and any other materials that contain or are hazardous substances, at [Defendans'] (sic) farm in such a manner that the pesticides, fungicides or other materials may drift or otherwise migrate beyond the boundaries" of the Farm. (*See* IOC of March 26, 1997 at ¶¶ 4 and 5 and EPA Administrative Order of December 20, 1996 at ¶ 32 (attachment 2)).

### *EXHIBIT B: TROPICAL FRUIT'S STATEMENT OF UNCONTESTED FACTS*

### STATEMENT OF OBJECTIONS TO PLAINTIFF'S STATEMENTS

1. ¶ 1, ¶ 2, ¶ 3, ¶ 4, ¶ 5, ¶ 6, ¶ 7, ¶ 8, ¶ 10 and ¶ 11 are not contested except that, with respect to the references made in paragraphs 4 and 5 and 8 as to Avshalom Lubin the same are contested inasmuch as Mr. Avshalom Lubin is not the managing partner of Tropical Fruit and is not a general partner of Tropical Fruit, S.P. It is

an entity named Grand Atrium the general partner of Tropical Fruit, and Mr. Toledo is the managing partner of Tropical Fruit since 1993. See copy of deed attached herein and deposition testimony of Mr. Lubin.[ ] Exhibit 1.

2. ¶ 9 and ¶ 12, relevant to the issue of liability under CERCLA are contested as they are not statements of fact but conclusions of law of the plaintiff referring to ultimate questions of law and elements of liability in this case. It is so evident that plaintiff was not able to support such statements by reference to any document or piece of evidence as all statements of fact in motions for summary judgment are to be presented. The question of whether the Tropical Fruit Farm is a facility under CERCLA and whether or not the movement of pesticides beyond the boundaries of the farm constitutes a release under CERCLA, are matters of law which defendants contest, not as factual matters but as a matter of law. Thus, we refer the Court to defendants' arguments in their opposition and cross motion for summary judgment on the issue of liability under CERCLA which specifically address these statements. .

3. As to ¶ 13, defendants sustain that the text of the law is uncontested. However, how the text of the law is to be interpreted is a matter likely to be disputed by the parties.

4. Defendants do not contest the specific instructions contained in the labels regarding application of the pesticides with respect to ¶ 14. Defendants do not dispute the text contained in the labels.

5. With respect to ¶ 15, defendants contest the paragraph as drafted; defendants only concede what was admitted in their pleadings to the effect that FIFRA defines the use of any registered pesticide in a manner inconsistent with its labeling to include the use of a pesticide in a manner not permitted by the labeling. Thus, defendants dispute ¶ 15 as drafted because the statement contained therein is not correctly sustained by the admission referenced from defendant's answer to the complaint.

6. It is undisputed that the statement contained in ¶ 16 appears on the labels for the pesticides named and it is further undisputed the contents of the labels in their totality. It is noteworthy that some of these pesticide labels also provide specific instructions for the user on how to avoid drift from application of the pesticide; those annotations are contained in some of the labels produced as evidence by plaintiff on attachment 4.

7. Defendants dispute the statements contained in ¶ 17 and ¶ 18 as those statements may intend, presented as factual averments to substitute the legal definition of drift; it is defendants position that the determination of whether or not an incident of pesticide "migration" constitutes "drift" according to FIFRA is a matter of law and an integrated legal standard which cannot be substituted or exclusively determined by the testimony of experts. In addition, defendants do not dispute that William Hunt, Jeffrey Jenkins and Robert Kriegger stated what appears on the transcript of their testimonies but dispute any rephrasing of their testimony in the fashion of a legal conclusion such as the ones appearing on paragraphs 17 and 18. For further support to the objection to these statements see opposition to motion for partial summary judgment on the issue of liability under FIFRA. In addition, these statements are disputed by defendants inasmuch as they may be presented as factual averments to sustain that the charged violations were actually committed when the statements are made in the form of an opinion which are not based upon the personal and direct knowledge of the witness of the fact in dispute.

8. ¶ 19 of Plaintiff's Statement is not disputed as the records that sustain the statement are not disputed by defendants.

9. ¶ 20 of Plaintiff's Statement is disputed as the same is not duly supported by the

statement contained in attachment 9, specifically in paragraphs 7–8. The statement of Palmira Rodríguez does not state in any way that the same pesticides, Kocide 101 and Supracide 2E actually migrated from the property; her testimony only attests that she smelled gas, however, the nature of the gas is not defined, nor it can be traced to the spraying of pesticide, neither there is a positive identification of the time when the smell was felt. Thus, the statement must be disregarded by the Court as it fails to establish the fact submitted. See additional arguments set forth in the opposition to the motion for partial summary judgment in relation to the admissibility of affidavits in support of motions under Rule 56. ¶ 20 is further disputed in accordance to scientific evidence of expert witness and statement of Mr. Hunt related to measures taken to avoid drift.

10. From ¶ 21, defendants do not dispute that on July 1, 1996, according to Tropical Fruit Spray Records, Kocide 101 and Supracide 2E were applied in farm sectors 2–4–6 between approximately 5:00 p.m. and 7:30 p.m. The statement of Roberto Maldonado in this respect is disputed.

11. ¶ 22 is disputed as the evidence submitted in support of the statement made is either inadmissible and does not support the fact plaintiff intends to establish. The statement of Mr. Maldonado (unsworn) merely attests that samples were taken from the side of the road sector. However the results of the analysis defendants contend, as a legal matter, are not admissible because they contain hearsay evidence, the chain of custody of the samples has not been established nor there is an adequate authentication of the document containing the results for admissibility by a competent witness. In addition it is defendants contention that whether or not the amounts of substances allegedly found in the samples taken constitute evidence of drift under FIFRA is a matter of law. The fact that pesticides migrated as to constitute drift of pesticide is also disputed

by defendants as per expert testimony evidence and proposed construction of FIFRA.

12. ¶ 23 and ¶ 24 are not disputed as the fact is shown in attachment 8 record for that day.

13. ¶ 25 is contested. First, defendants contend that the statement referred as evidence of the fact asserted does not sustain the fact and further, constitutes an inadmissible statement on the grounds of hearsay. Mr. Maldonado's statement is not based upon facts of personal knowledge but, upon statements referred by a third person. Furthermore, the validity of the statements of this third person is challenged by Mr. Maldonado, who in turn gives an *opinion* about the veracity of the third person's statement as to the date to which the statement is relevant. This Court must disregard the evidence submitted in support of this statement of fact which cannot be consider ad a fact in support of the motion for partial summary judgment. Defendants incorporate by reference the arguments set forth in their opposition to the motion for summary judgment with respect to the admissibility of the evidence submitted by plaintiff in support of their motion for summary judgment. In addition, the fact is contested in view of defendants's expert testimony regarding the issue of drift and the proposed construction and application of the pertinent sections of law.

14. ¶ 26 is admitted as the fact presented is duly evidenced in Tropical Fruit's Spray Records. References to Mr. Maldonado's declarations are disputed.

15. ¶ 27 is contested as migration may be defined as drift of the pesticide in view of defendants expert evidence and contentions of law.

16. ¶¶ 28 and 29 are disputed and plaintiff has failed to establish through competent evidence the facts asserted. First, the only document which makes reference to the specific pesticides allegedly being applied on the date at issue is the State-

ment of Luis Santos, attachment 13. The source of the information concerning the identity of the pesticides .constitutes hearsay, as it is information supplied to Mr. Santos, thus, the documents do not meet the requirement that the statements therein contained be personally known to the subscriber; in addition, to the fact that the document is unsworn. Thus, the rest of the declarations submitted fail to be admissible and to establish the proposed fact—that benlate and Tenn–Cop 5E were applied in the farm as none of the statements contain factual assertions as to time, date and identity of the pesticide which allegedly was being applied in farm sectors 1–3–5; indeed, most of the statements refer to smelling odors of unidentified sources or the observing of a mist cloud over the farm or incidents of witnesses that were allegedly "sprayed" not in their houses but, as they deliberately drove their cars, approached the farm and exposed themselves voluntarily to be sprayed by the machines! None of the statements sustain the facts averred in ¶ 28 and ¶ 29, thus, the evidence cannot be considered nor the facts in support of plaintiffs request for summary judgment on the issue of liability under FIFRA. See arguments contained in opposition to motion for summary judgment as to admissibility of evidence and compliance with Rule 56 requisites. Even if the fact is to be deemed as adequately sustained, defendants contest these facts as shown in their expert's testimony.

17. ¶ 30 is not disputed as shown in Tropical Fruits Spray Records.

18. ¶ 31 is disputed. Defendants first contend that the evidence submitted in suppul L of the averment of fact contained in ¶ 31 is not admissible and fails to comply with the requirements of Rule 56(c) of the Fed.R.Civ.P. Most of the statements fail to connect the witnesses' observations or trace them to the application of pesticides at the Tropical Fruit Farm on the date of the incident or most critical, state-

ments are drafted as legal conclusions which have been rejected by the courts as admissible evidence to be considered in support of a motion for summary judgment. For instance, ¶ 9 of Mr. Bonilla's affidavit (attachment 15) is stated in form of a legal conclusion, "that Tropical Fruit sprayed pesticides in a manner so as to cause the pesticides to drift onto [his] property". Certainly, we have a statement copied from the law which entails the ultimate legal conclusion in controversy in the case at bar. Defendants refer to the arguments set forth in their opposition to plaintiff's motion for partial summary judgment.

19. ¶ 32 is not disputed as the fact is sustain by Tropical Fruit's Spraying Records.

20. ¶ 33 is disputed. See defendants' arguments and objections to ¶ 31 above.

21. ¶ 34 is not disputed as the fact is established in Tropical Fruit's Spraying Records.

22. ¶ 35 is disputed. See defendant's arguments and objections to ¶¶ 31 and 33 above.

23. ¶ 36 is not disputed as the fact is established in Tropical Fruit's Spraying Records.

24. ¶ 37 is disputed. See defendants' arguments and objections to affidavits as stated in relation to ¶¶ 31, 33 and 35 above.

25. ¶ 38 is not disputed as the fact is established in Tropical Fruit's Spraying Records.

26. ¶ 39 is disputed. See defendants' arguments and objections to affidavits as stated in relation to ¶ 31 above. The affidavits can only establish the fact as to odors, however, are unable to trace the facts personally observed, such as odor, to the pesticides that were sprayed that day neither can attest that pesticides migrated.

27. ¶ 40 is not disputed as the fact is established in Tropical Fruit's Spraying Records. The rest of the statements and

documents submitted to sustain the facts are objected.

28. ¶ 41 is disputed. As stated above with respect to other statements, the specific portion of the statement by Lugo referenced in support of the fact asserted is based on hearsay and upon the mistaken notion that defendants admitted liability as to any of the charges made pursuant to the IOC. As the other statements, Lugo's declaration is filled with hearsay statements, conclusory statements and assertions which are legal conclusions which are not admissible in support of a motion for summary judgment and thus, fail to comply with the requirements of Rule 56(c). See arguments set forth in defendants' opposition to motion I for summary judgment.

29. ¶ 42 is not disputed.

30. ¶ 43 is disputed. Objections and grounds are incorporated by reference as stated in relation to ¶ 31 discussed above.

31. ¶ 44 is disputed. A reading of the label which contents is not disputed does not state a prohibition against the use of the product on mangoes. The label merely recommends the crops in which the product is effective.

32. ¶ 45 is disputed. Maldonado's statement represents an incomplete statement of the relevant facts as they occurred. As testified by Mr. Edilberto González during his deposition testimony, once he was advised of the use of the product, he ceased to use the product on mangoes. It is also Mr. González's testimony that he worked for a period of 13 years in another mango farm in Puerto Rico, also inspected by the Department of Agriculture and he was never advised that the product was not intended for use on mangoes and neither the label explicitly prohibited it. Once the deposition testimony is transcribed the Court will be supplied with copies of the pertinent part of the testimony in order to sustain defendants' objection to plaintiffs statement of fact.

33. ¶ 46 is disputed. Defendants contend that the text of the label is not disputed, however, plaintiffs redrafting and rephrasing of the text of the label is disputed as an inaccurate interpretation of the label's instructions.

34. ¶ 47 is not disputed as the fact is sustained by Tropical Fruit's spraying records. However, liability under that set of facts is disputed as there is evidence to be derived from Mr. Lubin's deposition testimony that not all fruits in a mango tree are at the same level of growth, thus, those that are yet in bloom stage must be sprayed with pesticide.

35. ¶ 48 is disputed as drafted. Defendants object any rephrasing of the contents of the labels and the applicable law and the statements contained in ¶ 48 cannot be presented as a factual statement but is rather a statement of law. On the other hand, defendants do not contest or object the labels and their text nor the law which speaks for themselves.

36. ¶ 49 is not disputed to the extent the same is sustained by the text of the labels.

37. ¶ 50 is disputed. Maldonado's statement is disputed in view of Mr. Edilberto Gonzalez's deposition testimony. The pertinent parts of the testimony will be produced to the court once the transcript is made available to the parties. In addition, the fact is disputed because the same does not represent the complete truth of the fact; once the inspector advise Mr. Maldonado regarding the charged conduct, the same was immediately corrected.

38. ¶ 51 is disputed. First, Maldonado's statement in support of the factual contention is a legal conclusion not admissible and which does not comply with the requirements of Rule 56(c) of the Fed. R.Civ.P. Second, it must be noted, that according to Edilberto González's statement, during the application of the solution, the applicator had all the personal protection equipment. Defendants will further provide evidence to contest this statement as per the testimony of Edilber-

to Gonzalez during his deposition, once the transcript is made available. As stated above, once Mr. Gonzalez was warned about the conduct the same was immediately corrected and no other violations of the same nature are found not can be established by competent evidence.

39. ¶ 52 is disputed. As stated above, Maldonado's statement is not confirmed as it purports to be by Mr. Gonzalez's signed statement of the inspection that took place on that date. Mr. Gonzalez's deposition testimony will serve to provide further basis to defendants' objection to this statement of fact. Once the transcript is made available, the evidence will be provided to the court.

40. ¶ 53 and ¶ 54 are disputed. Maldonado's statement does not fully confirm the facts averred in these statements; to the contrary, it provides evidence to the effect that there was indeed a decontamination area. In addition, Mr. Gonzalez's signed statement concerning the inspection (attachment 38) fails to state any of the facts relevant to the violations charged, thus, there is no corroboration, by documentary evidence endorsed by both parties that the claimed violations were actually observed during the inspection. Defendants reserve the right to supplement their objection to these statements once Mr. González's deposition testimony is fully transcribed or Mr Maldonado's deposition is taken.

41. ¶ 55 is disputed in part. Defendants do not dispute that according to the Spraying Records on July 2, 1996, pesticides were applied as therein stated. However, the charged conduct is disputed as per Mr. González's statement that there was a decontamination area and the fact that the attachment 12 fails to support any admission on the part of Tropical Fruit about the conduct imputed. Defendants reserve the right to supplement their objection to this statement once Mr. Gonzalez's deposition testimony is fully transcribed.

42. ¶ 56 is not disputed in accordance to the text contained in the label. Defendants stipulate the complete contents of the label rather than a partial reading of the same.

43. ¶ 57 is disputed inasmuch as, according to Mr. González's testimony, the conduct claimed was immediately corrected upon notice given. Evidence of transcript of Mr. González's testimony will be provided once available.

44. As to ¶ 58, defendants' position is that the terms and language of the IOC entered is self explanatory and most be read as a whole. Any reference or statement which contradicts or tends to confuse the correct reading of the order is contested by the appearing defendants. By entering into the IOC, defendants did not waive the right to raise defenses and contest liability in this case, and more specifically, contest that the alleged drift constitutes a violation of the statutes invoked in the specific factual background of this case.

### III STATEMENT OF FACTS MATERIAL TO THE ADJUDICATION OF LIABILITY WHICH HAVE BEEN OMITTED BY PLAINTIFF AND MUST BE CONSIDERED BY THE COURT

In defendants' opposition to the motion for partial summary judgment on the issue of liability under FIFRA, it is explained that there are defenses and factors that must be considered by the courts in adjudicating liability under FIFRA pursuant to federal precedents on the matter. Those factors of analysis have been completely ignored by plaintiff in its presentation of the facts material to the outcome of this case. Thus, as part of their opposition and showing that there are facts in controversy as to the issue of liability under FIFRA, defendants present the following facts, duly sustained by admissible evidence which defendants will present to the Court during the trial on the merits of the case as factors which impinge on the issue of

liability and that merit adjudication in favor of defendants.

1. Tropical Fruit, S.E. has implemented the best management practices related to its spraying operations, the most salient and important being the following:

a. Selection of Spray Equipment—The farm uses Durand Wayland Stainless Steel Air Blast sprayers that are considered of the best quality and most advanced technology in the United States sprayer market. Of these two machines, the one known as the "Smart Sprayer" employs an infra-red scanning system to took at the targets to be sprayed and opens and closes the nozzles according to the configuration of the trees. When there are no trees present, the unit does not release spray. The newer unit known as the Tower Spray produces a cross-flow spray pattern that radically reduces overspray by directing the pattern into the tree canopy.

b. Calibration of Spray Equipment— Both sprayers are calibrated to maximize foliage coverage with a minimum use of spray materials. The spray nozzles are premium ceramic nozzles. Ceramics prevent orifice wear that can distort spray patterns and contribute to excessive drifting and non-uniform coverage.

c. The sprayer operators, that are also the mixer/loaders', have received the training required for pesticide handlers by the Worker Protection Program and have been issued the corresponding EPA Cards. Most of these operators hold Pesticide Applicator Licenses, as does the person responsible for supervising the spray program.

d. All required safety equipment is used on the job by the operators, in line with the Worker Protection Standard.

e. Application records are issued and filed according to the Worker Protection Standard.

f. Pesticide Storage is maintained according to the Worker Protection Standard. All posters and notifications are in place.

2. The Tropical Fruit Farm takes a very serious approach to responsible application and compliance with rules and regulations. To whit, the fact that most of their operator's are licensed pesticide applicators bears out management's responsibility towards doing the best and safest job possible.

See Exhibit 2 of this Statement.

3. Defendants will present witnesses and documents pertaining its financial condition, how the pesticide control benefits or the lack thereof detrimentally affects the farm operation and harvest, economic losses sustained and that may be sustained due to unreasonable controls in pesticide application in effect or unreasonable reading of the law. The answers to interrogatories attached reflect plaintiff's evidence in this respect as well as the reports of experts which are still being completed. Once they are made available, the appearing party reserves the right to further supplement this motion with additional evidence. See Exhibit 3.

### EXHIBIT C: TROPICAL FRUIT'S STATEMENT OF UNCONTESTED FACTS RELATED TO ISSUE OF LIABILITY UNDER CERCLA

### STATEMENT OF MATERIAL FACTS THAT ARE NOT IN DISPUTE

The defendants have identified the following statements as relevant to the determination of liability under CERCLA: ¶ 1, ¶ 2, ¶ 3, ¶ 4, ¶ 5, ¶ 6, ¶ 7 in part, ¶ 8 in part, ¶ 9, ¶ 10, ¶ 11, ¶ 12, and ¶ 58 and general statements contained in other paragraphs which refer to the application of pesticides on crops at the Tropical Fruit farm.

The following statements, which we regard as factual pleadings, relevant to the determination of liability under CERCLA, or exemption therefrom are not disputed by the defendants. ¶ 1, ¶ 2, ¶ 3, ¶ 4, ¶ 5, ¶ 6, ¶ 8, ¶ 10, ¶ 11. These statements are stipulated as facts in support of defendants' cross motion for summary judgment under

CERCLA. We request the Court to take notice to the exception taken with respect to Mr. Avshalom Lubin's relationship with Tropical Fruit as duly supported by evidence submitted along with the opposition to plaintiff's statement of material facts.

For the pertinent purpose of its cross motion for partial summary judgment, defendants state as additional undisputed facts, the following:

1. The "movement" of pesticides constituting the "release" claimed within the meaning of CERCLA, results from the application of such pesticides to crops at the Tropical Fruit Farm in their customary use. See all other statements of fact contained in U.S.A.'s Statement of Material Fact referring and indeed, using the term **"application of pesticides."**

2. The United States has not pleaded the occurrence of a discharge as defined by the law nor has presented any evidence showing that a discharge occurred. See Complaint, and United States Statement of Material Facts.

3. Since beginning operations in 1991, Tropical Fruit applied many pesticides to its crops, including Benlate, Captan 50, Diazinon 500 AG, Dithane F–45, Kocide 101, Kocide LF, Malathion 25%, Microsperse Wettable Sulphur, Neemix, Soluble Oil Spray, Supracide 2–E, and Tenn–Cop 5E. See Plaintiff's Factual Contentions, page 2 of the Proposed Pre Trial Order. Tropical Fruit has used two types of air-blast sprayers—the Smart Sprayer and the Tower Sprayer to apply pesticides to its crops. See Plaintiff's Factual Contentions, page 3 of the Proposed Pre Trial Order. Thus, it is undisputed that the application of registered pesticides by the defendants consists of the placement of the pesticides over crops by the method of spraying, following their intended purpose where the pest control is desired.